**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 16-60731

United States Court of Appeals
Fifth Circuit

**FILED**

December 31, 2019

Lyle W. Cayce
Clerk

COURTNEY PAINE SNIDER,

> Plaintiff–Counter Defendant–Appellee, Cross–Appellant,

v.

L-3 COMMUNICATIONS VERTEX AEROSPACE, L.L.C.,

> Defendant–Counter Claimant–Appellant, Cross–Appellee

v.

WOMBLE CARLYLE SANDRIDGE & RICE, L.L.P.; CHARLES A. EDWARDS, individually and as employee, member, partner, shareholder, and/or officer of Womble Carlyle,

> Counter Defendants–Appellees.

Appeals from the United States District Court
for the Southern District of Mississippi

Before OWEN, Chief Judge, and JOLLY and STEWART, Circuit Judges.

OWEN, Chief Judge:

This suit was initiated when Courtney Paine Snider filed a complaint under Title VII of the Equal Rights Act of 1964 (Title VII)[1] against L-3

---

[1] Codified at 42 U.S.C. § 2000e et seq.

1

No. 16-60731

Communications Vertex Aerospace, L.L.C. (L-3).  L-3 asserted counterclaims against Paine Snider.[2]  It also brought into the suit and asserted claims against Womble Carlyle Sandridge & Rice, L.L.P. (Womble), and Charles A. Edwards.  L-3 appeals a summary judgment in favor of Paine Snider, Womble, and Edwards.  Paine Snider cross-appeals an order dismissing her Title VII claims.  We reverse and remand in part and otherwise affirm the district court's judgment.

**I**

Paine Snider, an attorney, was Deputy General Counsel of L-3 and worked from its office in Mississippi.  L-3 retained the Womble firm, located in North Carolina, as outside counsel from 2000-2009, and the firm represented L-3 in a variety of legal matters.  Edwards, a partner in that firm and its Labor and Employment Practice Group Coordinator until 2007, provided legal services to L-3 for a period of time, but the record reflects that L-3 ceased utilizing his services by September of 2005.  Prior to that time, Paine Snider and Edwards had worked together representing L-3 regarding various employment-related matters.  L-3's General Counsel and Paine Snider's immediate supervisor was Steve Sinquefield.  He told Paine Snider in 2006 that L-3 would no longer permit Edwards to perform its legal work.

Paine Snider believed as early as 2004 that she had been a victim of gender discrimination by L-3.  We will confine the background facts, however, to those pertinent to the issues in this appeal.  Email exchanges between Edwards and Paine Snider reflect that from 2005 to 2007, they discussed discrimination and related claims that Paine Snider had against L-3, and in an email sent to Paine Snider at her L-3 email address in June 2006, Edwards

---

[2] Courtney Paine Snider's briefing in our court referred to "Paine."  The district court referred to her as "Snider."  For clarity we refer to her as Paine Snider.

gave her legal advice as to when statutes of limitation would run on various claims.

Later in 2006, another L-3 employee, Janice Wolf, who reported directly to Paine Snider, submitted an internal ethics complaint alleging gender discrimination. L-3 suspected that Paine Snider had given legal advice to Wolf and otherwise assisted her in pursuing her grievances. L-3 was concerned that, in doing so, Paine Snider had violated her ethical obligations to L-3 as its legal counsel. L-3 engaged two outside law firms to investigate, and they submitted a written report to L-3 in December 2006. The report concluded that Paine Snider "likely committed multiple sins of omission in her duty of loyalty." It further reported that Paine Snider had made "derogatory statements" to L-3 officers about Steve Sinquefield; had told those officers that Sinquefield "was threatened by her ability and afraid she wanted his job"; and had "herself state[d] that she [could] no longer work with Sinquefield and . . . readily criticiz[ed] him to others within the Company." Furthermore, the report stated that she had "failed to avail herself of any of the avenues for formal complaint through HR or the ethics function." The report recommended in mid-December 2006 that L-3 consider terminating Paine Snider's employment.

During L-3's investigation of Wolf's internal complaint, Paine Snider asserted that she had also been the victim of gender discrimination and harassment, and she requested L-3 to conduct an internal investigation in January 2007. Though she subsequently withdrew that request, L-3 nevertheless initiated an internal investigation in January 2007 regarding Paine Snider's allegations and at the conclusion of that investigation the following month, reported its findings to Paine Snider. Paine Snider asked for further investigation, claiming that she had additional information, and she asked that a third party be engaged to consider the matter. L-3 brought in Jim

Slavin, a consultant on business and ethics conduct, whose office was in New York, to assist L-3's ethics officer.

At that time, the Womble firm represented L-3 in certain matters, though Edwards, still a partner at Womble, had done no work for L-3 since September of 2005. Nevertheless, Edwards had extensive personal contact with Paine Snider throughout 2006 and through May 2007. Without notifying or consulting L-3, he assisted Paine Snider in the spring of 2007 in preparing a lengthy written document for submission to Slavin describing Paine Snider's complaints of discrimination, harassment and retaliation, and identifying Steve Sinquefield as the primary offender. Edwards then directly contacted Slavin via email in early May 2007. He sought a meeting with Slavin in New York on May 15, 2007 to resolve Paine Snider's issues with L-3's officers. L-3 immediately called Edwards and his firm, asserting that they had a conflict of interest and that Edwards could not represent Paine Snider. Edwards's contact with Paine Snider about her claims against L-3 largely came to an end after L-3's parent company's general counsel, Kathleen Karelis, confronted Edwards and then expressed to Womble her dismay and concerns regarding Edwards's conduct.

Paine Snider filed her first complaint against L-3 with the EEOC a few months later, in August 2007, alleging harassment, gender discrimination, and retaliation for her internal ethics complaints. The EEOC complaint was essentially drawn from the internal complaint that Edwards was instrumental in preparing. By August 2008, Paine Snider, whose place of employment with L-3 was in Mississippi, had remained unlicensed to practice law in that state. Her failure to become a member of the Mississippi bar had long been a point of contention with L-3. It had asked her to sit for the July 2008 Mississippi bar examination. When L-3 learned she had not done so, it placed Paine Snider on an unpaid leave of absence in August 2008.

No. 16-60731

While Paine Snider was on leave, L-3 eliminated 26 positions in the company due to an economic downturn. Paine Snider's position was one of them. Her employment was terminated on February 6, 2009. As these events unfolded, Paine Snider amended her EEOC complaint three times, alleging continued retaliation. In August 2009, the EEOC informed Paine Snider that it was "unable to conclude" that L-3 had violated employment law, and it notified her that she had the right to sue L-3 within 90 days.

Paine Snider filed suit against L-3 in November 2009. She brought discrimination, harassment, and retaliation claims. Two years later, L-3 subpoenaed documents from the Womble firm and Janice Wolf, which they produced in November 2011 and March 2012, respectively.

L-3 alleges that from these documents, it first learned that Edwards had committed legal malpractice and breached his and his firm's fiduciary duties by advising and assisting Paine Snider in pursuing her discrimination claims against L-3 and by advising Janice Wolf regarding the discrimination claims she had pursued. L-3 filed a counterclaim against Paine Snider and also added claims against Womble and Edwards in February 2012. Several months later, in September 2012, Edwards's wife, Judy Edwards, filed suit against Paine Snider in a North Carolina state court seeking damages for alienation of affection. L-3 asserts that it obtained additional information about Edwards's breach of fiduciary duty and breach of the standards of care as a result of discovery in that North Carolina litigation.

Edwards left Womble two months after L-3 brought that firm and Edwards into the present litigation. Edwards died in September 2015. No suggestion of death has been filed, however.

The district court ultimately dismissed all of Paine Snider's claims as a sanction and granted summary judgment denying relief on all of L-3's claims,

No. 16-60731

concluding they were barred by the statute of limitations.  These appeals ensued.

## II

Among the issues L-3 raises are two procedural ones.  It complains that the district court *sua sponte* converted a motion to dismiss into a summary judgment motion and that the district court erred in denying L-3's motion for discovery under Rule 56(d).

The Womble firm filed a motion to dismiss, asserting lack of subject matter jurisdiction, improper joinder, and that the statute of limitations barred all of L-3's claims.  Both parties submitted documents outside the pleadings regarding the statute of limitations issue, and Womble argued that its motion to dismiss should be treated as a motion for summary judgment. The district court ordered the parties to file motions for summary judgment and scheduled a hearing to occur eleven days thereafter.

The district court did not improperly convert Womble's Rule 12(b)(6) motion into a Rule 56 motion.  Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under Rule 12(b)(6)[,] matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."[3]  This court has also said that "it is appropriate to treat [hybrid motions] as [motions] for summary judgment" when the motion's success depends on matters outside the pleadings.[4]  L-3 and Womble presented extensive documentation outside the pleadings, and the court did not exclude that evidence.  The district court followed an appropriate course.

---

[3] FED. R. CIV. P. 12(d); *see also Burns v. Harris Cty. Bail Bond Bd.*, 139 F.3d 513, 517 (5th Cir. 1998).

[4] *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193-94 (5th Cir. 1988).

No. 16-60731

The district court gave L-3 sufficient notice that Womble's motion to dismiss would be treated as a summary judgment motion. We have said that when a district court converts a Rule 12(b)(6) motion into a motion for summary judgment, the court must comply strictly with Rule 56's notice requirements.[5] Rule 56 requires that courts give parties "notice and a reasonable time to respond."[6] Interpreting this requirement, we have said that parties must have ten days to submit additional evidence once they are put on "fair notice" that a "court could properly treat [a Rule 12(b)(6)] motion as one for summary judgment."[7] Parties are on fair notice as soon as they know a district court has accepted matters outside the pleadings for consideration on a Rule 12(b)(6) motion.[8] Although "giv[ing] express notice" that the court might convert the motion to dismiss is "the better practice," the "failure to give such notice does not require reversal."[9]

The district court gave express notice, though L-3 was arguably on fair notice as early as May 30, 2013, when L-3 submitted extensive matters to support its opposition to Womble's motion to dismiss. L-3 received actual notice at the March 17, 2016 hearing when Womble argued for conversion of its motion to dismiss into a summary judgment proceeding, L-3 responded to those arguments, and the district court expressed interest in conversion. The district court then gave L-3 eleven days to file a motion for summary judgment, held a summary judgment-specific hearing, and did not rule on the summary

---

[5] *Clark v. Tarrant County*, 798 F.2d 736, 745 (5th Cir. 1986) (first citing *In re. Hailey*, 621 F.2d 169 (5th Cir. 1980); and then citing *Underwood v. Hunter*, 604 F.2d 367, 369 (5th Cir. 1979) (per curiam)).

[6] FED. R. CIV. P. 56(f).

[7] *Clark*, 798 F.2d at 745-46.

[8] *Id.*

[9] *Id.* (citing *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 392 (6th Cir. 1975)).

judgment motion until October 17, 2016. L-3 received more than the ten-day notice that our precedent requires.

L-3 asserts that the district court "ignored" its request for additional discovery and that the summary judgment must be reversed. L-3 filed a response in opposition to Womble's motion to dismiss and motion for summary judgment asking the court to defer ruling on Womble's motion and to allow discovery pursuant to Rule 56(d). When the district court ruled on Womble's motion for summary judgment, the court did not explicitly reference L-3's Rule 56(d) arguments.

When a district court enters a final judgment, it has implicitly denied any outstanding motions, even if the court does not explicitly deny a particular motion.[10] We have held that a court does not abuse its discretion by entering summary judgment without expressly ruling on a pending Rule 56(d) motion.[11] The district court here held that "by granting [the Womble firm's] motion for summary judgment, this court has resolved all the disputes in this cause" and dismissed the litigation entirely. Under our precedent, the district court implicitly denied L-3's Rule 56(d) motion when it so ruled.

L-3 cites an unpublished opinion, *Galaxy Tire, Inc. v. Terwilliger*.[12] But in *Galaxy Tire*, we reversed because a Rule 56(d) motion was pending and there was evidence that the district court unintentionally overlooked that pending motion.[13] There is no such evidence in the present case. In fact, the district court ruled on L-3's first request for discovery at the March 17, 2016 hearing. When L-3's counsel learned that the district court might convert Womble's motion, she said that "if the court is going to consider it as . . . a Rule 56

---

[10] *Tollett v. City of Kemah*, 285 F.3d 357, 369 n.* (5th Cir. 2002).

[11] *See Mendez v. Poitevent*, 823 F.3d 326, 336-37 (5th Cir. 2016).

[12] 189 F.3d 469 (5th Cir. 1999) (per curiam).

[13] *Id.*

No. 16-60731

motion . . . what we need is discovery." L-3 then added that it needed discovery regarding Womble's knowledge in connection with the statute-of-limitations issue. The district court was unconvinced and ruled that it was "not going to allow discovery." In any event, the district court implicitly denied the Rule 56(d) motion when the court granted summary judgment.

### III

The central issue in L-3's appeal is whether the district court erred in holding that all of its claims are barred by the statute of limitations. L-3 asserted four causes of action against Womble, Edwards, and Paine Snider, which were (1) breach of fiduciary duties, (2) civil conspiracy, (3) unjust enrichment, and (4) conversion. L-3 also asserted a negligent retention and supervision claim against Womble. L-3 argues that these claims arise out of differing factual circumstances that it categorizes as (1) "the legal assistance Edwards provided to" Paine Snider, (2) "the legal assistance that Edwards provided to Wolf," (3) Womble's "failure to disclose . . . the legal assistance Edwards provided to [Paine Snider] and Wolf when [Womble] discovered it," and (4) Paine Snider's "misappropriation of confidential client documents."

L-3 concedes that each of its causes of action is governed by the same Mississippi three-year statute of limitations, Miss. Code § 15-1-49.[14] But L-3

---

[14] That statute provides:

§ 15-1-49. Actions without prescribed period of limitation; actions involving latent injury or disease

(1) All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after.

(2) In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury.

9

No. 16-60731

asserts that there are factual disputes regarding the discovery rule, the fraudulent concealment doctrine, and the continuing tort doctrine that preclude summary judgment.  We conclude that the district court's grant of summary judgment on the statute-of-limitations issue should be affirmed as to all claims except those regarding assistance that Edwards provided to Wolf and Paine Snider's alleged misappropriation of confidential documents.

## A

L-3 filed its counterclaim against Paine Snider and claims against Womble and Edwards in February 2012.  Three years prior would be February 2009.  Under Mississippi law, "the discovery rule [i]s the proper test for deciding when the statute of limitations for a legal malpractice action begins to run."[15]  The Mississippi Supreme Court has explained:

> The discovery rule is applied when the facts indicate that "it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act."  In [*Smith v. Sneed*, 638 So. 2d 1252, 1255-56 (Miss. 1994)], the Court found that the discovery rule applies when it would be impractical to require a layperson to have discovered the malpractice at the time it happened.  This is because requiring a layperson to ascertain legal malpractice at the time it occurs would necessitate the retention of a second attorney to review the work of the first.[16]

In-house attorneys for L-3 and its affiliates were directly responsible for investigating Edwards's, the Womble firm's, and Paine Snider's respective

---

(3) The provisions of subsection (2) of this section shall apply to all pending and subsequently filed actions.

[15] *Bennett v. Hill-Boren, P.C.*, 52 So. 3d 364, 369 (Miss. 2011) (quoting *Channel v. Loyacono*, 954 So. 2d 415, 420-21 (Miss. 2007)) ("Under the discovery rule, as applied in a legal-malpractice action, the statute of limitations begins to run on the date that the plaintiff learns, or through reasonable diligence, should have learned, of the negligence of the lawyer.").

[16] *Id.* (citations omitted).

conflicts of interest and for investigating the relationship between Edwards and Paine Snider.

Even when ascertaining legal malpractice involves only laypersons, "[t]he question of whether a statute of limitations is tolled by the discovery rule often turns on the factual determination of 'what the plaintiff knew and when.'"[17]  The Mississippi Supreme Court has explained that often, the facts are such that the court, not a jury, decides the issue: "Occasionally the question of whether the suit is barred by the statute of limitations is a question of fact for the jury; however, as with other putative fact questions, the question may be taken away from the jury if reasonable minds could not differ as to the conclusion."[18]  The Mississippi Supreme Court has held that "[a]n individual may not take shelter in the 'discovery rule' when reasonable minds could not differ that the plaintiff possessed sufficient information to bring a claim."[19]

In the present case, the district court concluded that L-3 knew or should have known of its claims against the Womble firm, Edwards, and Paine Snider by May 2007.  We agree as to all claims, except those involving Edwards's assistance to Wolf and those involving Paine Snider's alleged misappropriation of confidential documents.

Paine Snider's co-worker, Janice Wolf, filed an internal complaint in 2006 after a meeting among Paine Snider, Wolf, and Steve Sinquefield.  In-house counsel at L-3's parent company stated in an interview investigating Wolf's allegations that "[i]t appears [Paine Snider] is advising [Janice Wolf], which is a terminable offense.  Steve Sinquefield has contracted with an outside law firm specializing in legal ethics to investigate this."  The Whitten

---

[17] *Raddin v. Manchester Educ. Found., Inc.*, 175 So. 3d 1243, 1249 (Miss. 2015) (quoting *Stringer v. Trapp*, 30 So. 3d 339, 342 (Miss. 2010).

[18] *Id.* (internal quotation marks omitted) (quoting *Stringer*, 30 So. 3d at 342).

[19] *Id.* (internal quotation marks omitted) (quoting *Huss v. Gayden*, 991 So. 2d 162, 167 (Miss. 2008)).

Report, dated December 12, 2006, was a product of the resulting investigation. Among many other conclusions, it reported that "[Paine Snider] has repeatedly participated in inappropriate email correspondence with her co-workers. L-3 provided copies of approximately 1375 emails to or from[, among others, Courtney Paine Snider,] Charlie Edwards[, and] Janice Wolf."

The Whitten Report clearly reflects that by at least December 2006, L-3 had access to emails on its server between Paine Snider and Edwards, had in fact accessed them, and had provided at least some of them to outside counsel. The Whitten Report was sent on December 13, 2006, to Kathleen Karelis, the general counsel for L-3's parent company. At this point in time, Edwards had not performed legal work for L-3 for more than a year, and from L-3's standpoint, there was no business reason for any contact between him and Paine Snider during 2006 and beyond.

Shortly after it received the Whitten report, L-3 initiated an internal review of Paine Snider's assertion that she had suffered harassment, discrimination, and retaliation. L-3 involved Jim Slavin in assessing Paine Snider's ongoing internal complaints. In April 2007, Edwards assisted Paine Snider in drafting a lengthy written document that was presented to Slavin detailing Paine Snider's allegations against officers at L-3. Edwards's participation in pursuing these claims was evidenced in emails on L-3's server between Edwards and Paine Snider, and between Paine Snider's L-3 and AOL accounts. The subject line of an email from Edwards to Paine Snider with Edwards's edits of what Paine Snider had initially sent to him was "Private and Confidential. For your eyes only."

On May 3, 2007, a Thursday, Edwards directly contacted Slavin on behalf of Paine Snider via email. That email was remarkable for many reasons. It opened by saying, "Mr. Slavin, I am a good [friend] of Courtney Paine [Snider] and have represented L-3 Vertex and its predecessors in a

number of significant matters." It stated that Edwards was "one of the Company's regular outside counsel," even though Edwards and in-house counsel at L-3 knew that Edwards no longer performed work for L-3 at the insistence of L-3's general counsel Steve Sinquefield. Edwards's email advised Slavin that Edwards had "personal knowledge that someone other than [Paine Snider] has had access to her business emails." Edwards also said that he knew of L-3's and Slavin's assurances to Paine Snider that her email was not being monitored. Edwards then issued a veiled threat to Slavin regarding the monitoring of email in saying "[a]fter all, retaliation is also against both the law and Company policy." In the email to Slavin, Edwards suggested that he and Slavin meet and also involve "corporate-level representatives" and Kathleen Karelis, the new general counsel for the corporate parent, "to get all this behind us. In my view, we are all on the same 'side[.]'" Edwards continued, "I hasten to add that there is no desire on Courtney's part, or on mine, to create embarrassment or personal difficulty for anyone; instead, Courtney simply hopes for a solution which will enable her to eliminate enormous stress and insecurity from her life, and that would seem to be equally in L-3's best interests." Edwards offered to meet with Slavin in New York on May 15, explaining that "Courtney would be unable to attend because her own commitments on Company legal matters render her unavailable early that week and are likely to prevent her attendance at the Legal Department meeting in Miami as well."

Within minutes of receiving Edwards's email, Slavin forwarded it to Kathleen Karelis. Slavin advised Karelis: "Attached is an email from an attorney who suggests that he could represent Courtney in resolving the issues. I have not nor do I plan to reply unless you tell me to do so." The next day, Friday, May 4, 2007, Karelis attempted to call Edwards, but he was not at his office. The following Monday, May 7, 2007, Edwards emailed Karelis to

13

say "[s]orry I missed your call Friday" and said he was now available to talk to her.  Karelis called Edwards that day.  Following that conversation, Edwards wrote two more emails to Karelis that same day.  The first was succinct.  He thanked Karelis "for your expression of the Company's position in this regard," and then he said, "I will not be involved in this situation from this point forward."  In the second email, sent in the afternoon with the reference line "our conversation," Edwards told Karelis, "I respect, but disagree with, your position."  Edwards said that he "could never represent either the Company nor Courtney were there to be some adversary proceeding due to my being a fact witness as to some aspects of this situation."  He expressed his view that L-3 should not "forc[e]" Paine Snider to divulge "confidential and privileged information to an outsider or a government agency."  Edwards then asserted, "I do not believe there are any material matters ongoing in which I or my Firm are representing or advising L-3 in any manner," but he assured Karelis that "I will continue to reject any engagement which would compromise my ethical position as your former counsel."  He stated, "I remain willing to assist you in reaching a resolution, and continue to extend my offer to participate to the extent you see fit."  He then detailed Paine Snider's travel plans on "legal matters for" L-3 over the next three weeks, indicating his detailed knowledge about Paine Snider's activities and plans.  Edwards adamantly expressed his belief in Paine Snider's fidelity to her employer and then closed the email by asserting that Karelis had not "been provided most of the pertinent facts" and "urg[ing her] to inquire deeply into the situation," noting that "it would be very unfortunate if actions were taken or decisions made without such an objective assessment."

The following day, May 8, 2007, email exchanges occurred between Karelis and Paine Snider.  Karelis said, "[a]s to Charles Edwards, he and his Firm, represent L-3.  Unquestionably, he has a conflict of interest and,

therefore, cannot represent you against the Company." Karelis told Paine Snider that she was willing to talk with her, but "[i]f you do not want to have a telephone conversation with me, then I suggest you consider engaging a lawyer that does not have a conflict of interest to represent you. I would be happy to talk with any such attorney that you engage."

Paine Snider responded promptly that day, asserting that "Charles Edwards was not representing me against L-3. He was hoping to further L-3's interest in trying to resolve an untenable situation to the benefit of all concerned." Paine Snider told Karelis, "[w]hen I first approached [Edwards] with this, he deeply considered the potential for conflict before we went into detailed discussions. He is a good friend and I would never have put him in a position that would compromise his professionalism. He found that our interest[s] were congruent, not divergent." Yet, Edwards did not discuss with L-3 the potential, if not actual, conflict of interest before he discussed with Paine Snider her claims against L-3. L-3 was never consulted as to whether its interests and those of Paine Snider were "congruent." Without seeking a waiver of actual or potential conflict from L-3, Edwards undertook to assist Paine Snider in asserting claims against L-3 officers, including Steve Sinquefield, who had effectively terminated the association of Edwards as outside counsel by late 2005.

The same day that Karelis and Paine Snider corresponded in these emails, May 8, 2007, Karelis called Elizabeth Quick, an attorney at Womble. In Quick's words, Karelis expressed "L-3's unhappiness with [Womble] attorney Charlie [Edwards's] involvement with L-3 in-house counsel Courtney Paine [Snider] and her complaints of employment discrimination against another L-3 in-house counsel." Karelis "also informed [Quick] that Edwards and [Paine Snider] have a very 'personal relationship' and [that] they have exchanged a number of emails." Quick recounted that Karelis said that she

15

was going to "forward . . . one or more of [Edwards's] emails," and that same day, L-3 sent four emails regarding Edwards to Quick. They were Edwards's May 3, 2007 email to Slavin, and Edwards's three emails on May 7, 2007 to Karelis. Quick "immediately contacted [Womble's] General Counsel William 'Bill' C. Raper and informed him of this matter since [she] believed it might involve a claim being made against Edwards [or Womble]."

Bill Raper attempted to contact Karelis and her assistant Belinda Logan at the headquarters of L-3's parent company the next day, on May 9, 2007. He sent an email to Logan the following day recounting that both she and Karelis were out when Raper called about "our lawyer [C]harlie [E]dwards." Raper said, "[I] have just begun looking into the situation. [A]s soon as I have had an opportunity to review our IT material, [I] will likely want to talk with you or [Ms. Karelis]. [I]n the meantime, feel free to contact me. [I] look forward to talking with you."

Six days later, on May 16, 2007, Raper emailed both Karelis and Logan saying, "[I] left a telephone message for you today, as [I] understand that you will be out of the office for the rest of the week. [I] have looked into the issue you raised regarding my partner[, Charlie Edwards], and I am ready to discuss [it] with you if you wish. [Mr. Edwards] will have no further involvement with L-3 or its personnel." No one from L-3 returned Raper's call, responded to his email, or requested information as to what the Womble firm's "IT material" revealed.

Three months later, in August 2007, Paine Snider filed a complaint with the EEOC alleging L-3 had engaged in harassment, gender discrimination, and retaliation for her internal ethics complaints. L-3 retained the Phelps Dunbar law firm, which filed with the EEOC a lengthy, detailed response to Paine Snider's charges. Included in the Phelps Dunbar EEOC response was an account of the contact between Paine Snider and Slavin in early 2007. The

response noted that, "[b]ecause Mr. Edwards had a conflict of interest, L-3 would not agree to meet with him."

Had L-3 searched its email server in May 2007, it could have discovered (if it had not already discovered) that Edwards had assisted Paine Snider in drafting the detailed, written internal complaint against L-3 officers that Paine Snider sent to Slavin. She later used that internal complaint document as the basis for her initial EEOC filing. Both the EEOC complaints and the submission to Slavin were available for L-3's inside and outside counsel to compare in August 2007.

By May 2007, L-3 knew that Edwards had a conflict of interest with regard to Paine Snider's allegations against L-3 officers and that Edwards had attempted to intervene on Paine Snider's behalf in her pursuit of those claims. It confronted Edwards and the Womble firm in May 2007, expressly referencing a "conflict of interest." Certainly, when Paine Snider first filed her EEOC claim, in August 2007, and L-3 expended attorney's fees to retain outside counsel to defend the allegations, "reasonable minds could not differ that [L-3] possessed sufficient information to bring a claim"[20] against Edwards and the Womble firm based on the assistance Edwards had provided to Paine Snider. L-3 could have brought an action against Edwards for breach of the standard of care and conduct and breach of fiduciary duty. Paine Snider's claims against L-3's officers remained essentially the same from the time she submitted the written internal complaint document that Edwards had a hand in drafting until her initial EEOC filing.

In May 2007, L-3 had additional information contained in emails on its server, including evidence that a relationship between Paine Snider and Edwards unrelated to Edwards's representation of L-3 had developed by 2005.

---

[20] *Id.* at 1249 (quoting *Huss*, 991 So. 2d at 167).

No. 16-60731

Edwards sent Paine Snider numerous emails to her L-3 email address, which was monitored or capable of being monitored by L-3. These included an email from Edwards to Paine Snider at both her L-3 and AOL email addresses that said, "Vanquisher of lesser women (and who isn't?), dazzler of men, and ruler of all she surveys. Good night, Gorgeous. — Your Buddy." A month later, on November 5, 2005, Paine Snider wrote to Edwards using her L-3 email account:

> Things are making me too too nervous. Please no calls from home or around home. It will lead you to ruin and I can not participate in that. I feel very strongly that I must be a cheerleader for you, your marriage, you[r] children and grandchildren and your lovely future on Beemer Knob. So no more. Email only to [AOL]. The head of IT asked to see me and I'm afraid it is about my [number] of emails coming through the system. Steve [Sinquefield] would have a hayday with that [and] perhaps even try to fire me. That worries me too. I'll check my [AOL] frequently, I promise. Have a lovely weekend. Love your family. Forget the rest.

In an email dated a few months later, sent to Paine Snider's L-3 email account, Edwards writes, on a Sunday morning in 2006, "I'm having to polish silver today but will call when I can. Let me know if there's any time that won't work for you. What I really want to do is to come out there and be with you." Several months after this, in July 2006, Edwards sent two emails to Paine Snider at her L-3 email address, the first of which stated, "can I come live with you?" and the second of which referred to "monkey business" and, with reference to "can I come live with you?" in the subject matter line, stated: "[h]appy to stay in your carriage house, the trunk of your car, wherever." Edwards later candidly described his relationship with Paine Snider in his 2013 deposition in the North Carolina alienation-of-affection suit brought by his wife. In relating that Paine Snider had told him she intended to describe their relationship as "platonic," Edwards recounted that he knew no one would believe that was an accurate representation: "[P]articularly after my attorney-

client relationship with L-3 came to an end, it would be preposterous to say that . . . our relationship was platonic."

Other emails in 2006, when Edwards was no longer representing L-3 but his firm was, reflect detailed exchanges about a claim that Paine Snider might make against L-3. In a May 9, 2006 email to Paine Snider at her L-3 account, the subject line of which was "I'm worried about you," Edwards said,

> [w]hen we have time, and you feel like it, I would like to formulate an action plan to get you out of the rut you're in. Time to stop defense and move to offense. You're enormously capable and underappreciated. Let's capitalize on your strengths to turn that around. Your team of two has had great victories before, and we need to get back on track. Rest well and let me know when you're awake again.

A month later, upon the death of a senior officer at L-3, Paine Snider wrote the following to Edwards in a June 9, 2006 email on the L-3 email server: "May need to think of what to do with my case and when prior to the fat lady singing! When will the statute run? Has it already on previous payout?" Edwards replied to her at the same L-3 email address, giving advice about the statute of limitations applicable to her claims against L-3:

> [One hundred and eighty] days from the discriminatory act for Title VII; two years for Equal Pay Act (which would be a stretch). But we can argue continuing violation if we have to. The real deal is that a claim would cloud the title and they'd have to deal with you. When I come to MS (if that ever happens) we can strategize; take the day off and we'll work on it. Otherwise, we can come up with a business plan now.

The operative facts that L-3 had available to it in May and August of 2007 with regard to Edwards's assistance to Paine Snider were the same as those presently asserted in this suit. More information concerning Edwards's possible motives, and more graphic details about the relationship, including collusion between Edwards and Paine Snider, are now known from emails sent or received solely through Paine Snider's AOL account. For example, Edwards

No. 16-60731

began an email to Paine Snider with "legal advice." He advised her how to document what she experienced at work and told her to send that information to him "so they are part of an attorney-client communication." Edwards corresponded with Paine Snider about covering their tracks, writing that they could not do much "about the electronic trail" and adding that "some scrubbing might be good if we can figure out how to do it without making anything worse." Other emails also showed that Edwards discussed internal company dynamics with Paine Snider with an eye toward sending more work to Womble.

But even without access to emails sent or received only on Paine Snider's AOL account, L-3 could have stated the same claims in 2007 against Edwards and the Womble firm that it first asserted in 2012 regarding Edwards's association with Paine Snider.

## B

L-3 argues that the fraudulent-concealment doctrine tolled the statute of limitations. Under Mississippi law, "[t]he requirements to show fraudulent concealment of a cause of action are (1) a subsequent affirmative act of concealment [by the defendant], and (2) due diligence [by the plaintiff]."[21] "The fiduciary relationship that exists between attorney and client creates a duty of disclosure," and "[w]hen a fiduciary relationship exists, the failure to disclose can be an affirmative act."[22] Accordingly, an attorney's failure to disclose his or her malpractice can be an affirmative act that satisfies the first requirement.[23] It does not, however, dispense with the second requirement.

L-3 knew in 2007 that Edwards had acted to assist Paine Snider in pursuing her claims that officers of L-3 had harassed, discriminated against,

---

[21] *Bennett v. Hill-Boren, P.C.*, 52 So. 3d 364, 372 (Miss. 2011).

[22] *See id.* at 372-73 (first citing *Waggoner v. Williamson*, 8 So. 3d 147, 154 (Miss. 2009); and then citing *Poe v. Summers*, 11 So. 3d 129, 134 (Miss. Ct. App. 2009)).

[23] *See id.*

and retaliated against her. It had access to emails between Edwards and Paine Snider reflecting that Edwards participated in drafting a detailed written internal complaint document cataloging the facts and incidents supporting Paine Snider's claims. L-3 contacted Edwards and Elizabeth Quick, both partners at Womble, and expressly asserted that Edwards had a conflict of interest. L-3 failed to follow up with the Womble firm after it was apprised in writing by Bill Raper of that firm that he would investigate IT material, and subsequently, that he had investigated and was ready to talk to the general counsel of L-3's parent company about Edwards's involvement with Paine Snider's claims against L-3. The fact of Edwards's assistance to Paine Snider and the conflict of interest was well-known to L-3 by May 2007, and there was no fraudulent concealment after that date. L-3 had facts in hand certainly by August 2007 that would have supported a lawsuit against Edwards and the Womble firm for breach of fiduciary duty and conflict of interest. Whatever Edwards had concealed prior to May 2007 was no longer an impediment to L-3's recognition that it had a claim against Edwards and his firm.

Nor did L-3's actions after its May 2007 encounters with Edwards and his firm regarding Paine Snider constitute due diligence on L-3's part. It had access to its own email server and had in fact readily found emails between Edwards and Paine Snider in 2006 when it gave those and other emails to outside counsel.

L-3 argues that the Womble firm and Edwards had a continuing obligation to disclose their own breaches of fiduciary duty and legal malpractice. We do not know what Womble would have disclosed to L-3 in May 2007 had L-3 responded to Raper, a partner at Womble, when he called and emailed offering to discuss what his investigation into the Edwards/Paine Snider matter had revealed. We do know, however, that as of that point in time, L-3 knew that Edwards had breached the standard of care and his

fiduciary duty.   We also know that when, late in 2011, L-3 subpoenaed documents from the Womble firm, the "new" information was somewhat more salacious and provided additional evidentiary support.  But the nature of and essential facts supporting L-3's claims against Edwards and Womble remained unchanged since 2007.

The district court did not err in granting summary judgment in favor of Edwards and the Womble firm as to the fraudulent concealment and duty to disclose arguments.

## C

The district court correctly concluded that the statute of limitations as to L-3's claims against Paine Snider, Edwards, and Womble was not tolled by the continuing tort doctrine.  In *Thomas v. Cook,*  a case in which a client asserted that his former attorney breached the standard of conduct by representing the client's adversaries, the Mississippi Court of Appeals held that "what determines when the statute of limitations begins is not when representation is concluded, but rather when a client (or former client) discovers an attorney's malpractice."[24]  The Mississippi court held in that case that the client's claim against his former attorney accrued when the client was notified that his former attorney was representing an adversary of the client.[25]

In *Thomas*, the plaintiff contended that his former attorney's continued representation of the plaintiff's adversary for three years after the plaintiff was notified of the representation constituted a continuing tort that "kept the tort alive and ongoing."[26]   The Mississippi Court of Appeals rejected this argument.[27]

---

[24] 170 So. 3d 1254, 1261 (Miss. Ct. App. 2015) (citing *Bennett,* 52 So. 3d at 370).
[25] *Id.*
[26] *Id.*
[27] *Id.*

No. 16-60731

The Mississippi Supreme Court has repeatedly held that the fact that an attorney or law firm continues to represent a client after breaching a standard of care (committing legal malpractice) does not toll the statute of limitations. "In adopting the discovery rule, the Mississippi Supreme Court has expressly rejected the 'continuous representation rule'—i.e., the tolling of the statute of limitations in a legal-malpractice action until an attorney has completed the representation in the matter in which the malpractice was committed."[28]

L-3's contentions regarding a continuing tort or wrong, as well its argument that any contact between Edwards and Paine Snider after she filed her initial EEOC complaint constitute discrete wrongs or torts, are not well-taken.  L-3 contends that it has been required to defend Paine Snider's suit against it for years, and that its entanglement in the suit is a consequence of Edwards's and the Womble firm's breach of the standard of care.  As the Mississippi Court of Appeals explained in *Thomas*, "[a] continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation."[29]  In *Thomas*, "any distress [the plaintiff] experienced during the three years of litigating against [the plaintiff's former attorney] was part of the 'continual ill effect' of [the plaintiff's former attorney's] decision to take on the adverse representation in the first place—a continuing wrong, not a continuing tort."[30]  The district court did not err in concluding that there was no continuing tort.

---

[28] *Id*. (first citing *Bennett*, 52 So. 3d at 369-70; and then citing *Stevens v. Lake*, 615 So. 2d 1177, 1183 (Miss. 1993)).

[29] *Id*. (alteration in the original) (internal quotation marks omitted) (quoting *Stevens*, 615 So. 2d at 1183).

[30] *Id*. (first citing *Stevens*, 615 So. 2d at 1183; and then citing *Smith v. Sneed*, 638 So. 2d 1252, 1255-56 (Miss. 1994)).

No. 16-60731

## D

Based on the record currently before us, reasonable minds could differ, however, as to when L-3's cause of action accrued as to its claims against Edwards and the Womble firm based on Edwards's assistance to Janice Wolf regarding her allegations of discrimination by L-3.

L-3 deposed Wolf, who testified that she had never discussed her claims or Paine Snider's claims with Edwards. Discovery continued, and L-3 served document subpoenas on Wolf and Womble in 2011. Wolf produced emails that cast doubt on her deposition testimony. The emails show that in November 2006 Edwards asked a non-Womble attorney to represent Wolf in pursuing discrimination and harassment claims against L-3. Edwards informed the attorney of L-3's policies and provided suggestions on how to draft a letter to L-3 describing Wolf's claims. Edwards and the attorney also discussed Wolf's evidence and drafts of her complaints. This email chain also revealed that Paine Snider told Wolf to ask Edwards for help with her complaint. None of this evidence was on L-3's email server. The summary judgment in favor of Edwards and the Womble firm regarding Edwards's assistance to Wolf was not warranted based on the record currently before us.

## E

Summary judgment was also inappropriate with respect to L-3's allegations that Paine Snider misappropriated its confidential client documents. L-3 brings this cause of action against Paine Snider under the theory that certain documents produced by Paine Snider in this litigation were obtained by Paine Snider from L-3's files without authorization. To support this claim, L-3 asserts that, during a 2011 deposition of Sinquefield, Paine Snider's counsel produced a binder of tabbed documents, which included a document labeled "L-3 Vertex Aerospace Legal Update." The legal update was marked as "confidential" and "attorney-client privileged" because it contained

24

information about ongoing litigation against L-3, including Paine Snider's case against her former employer. According to L-3, the only reasonable inference to be drawn from her counsel's possession of the legal update is that Paine Snider provided it to her attorney even though she did not have L-3's permission to do so. L-3 included information surrounding Paine Snider's production of these documents in support of its counterclaims against Paine Snider. Notably, L-3 does not allege, and the record does not suggest, that Edwards or the Womble firm were involved in Paine Snider obtaining these confidential client documents. Accordingly, L-3's claims based on these facts are necessarily brought against Paine Snider alone.

Paine Snider has pointed to no evidence that L-3 was aware that she possessed the legal update until her attorney produced the document during discovery in 2011. Nor has Paine Snider presented evidence that L-3 knew she was providing unauthorized third parties with access to its proprietary information prior to 2011. We therefore conclude that the district court erred when it held that, as a matter of law, the statute of limitations had run on L-3's cause of action based on Paine Snider's misappropriation of confidential client documents. Summary judgment on this cause of action was improper.

**IV**

In her cross-appeal, Paine Snider provided two reasons why this court should overturn the district court's dismissal of her Title VII claims and remand the case for trial. First, Paine Snider argues that the district court violated her due process rights by imposing an inherent-authority sanction before giving her notice and an opportunity to respond. Second, Paine Snider argues that by dismissing her entire claim as a sanction the district court abused its discretion.

25

## A

Paine Snider's underlying Title VII complaint against L-3 was dismissed at a June 29, 2015 hearing on L-3's motion for sanctions pursuant to Federal Rule of Civil Procedure 37(b). L-3 alleged that Paine Snider committed two discovery violations during the Title VII litigation: perjury and failure to produce documents. L-3 asked the district court to dismiss Paine Snider's claims as a sanction. The court held a lengthy hearing that included arguments from L-3, Paine Snider, and Womble. Ruling from the bench, the court cited Paine Snider's extensive ethical misconduct (both during and before the Title VII litigation) and also found that she concealed Edwards's assistance in her written discovery responses and in her deposition testimony. The court dismissed Paine Snider's Title VII claim as a sanction for that conduct. Paine Snider asked the court to reconsider its order. The district court held a three-day hearing on the motion to reconsider and issued a separate thirty-page order again dismissing Paine Snider's claims for substantially the same reasons.

A court "must comply with the mandates of due process" when imposing sanctions.[31] A court should not impose inherent-authority sanctions without providing "fair notice [of possible sanctions] and an opportunity for a hearing."[32] The United States Supreme Court has not further defined "fair notice" in the inherent-authority sanctions context, and neither have we. Also at issue here, when a party has had "a full opportunity to articulate their objections"[33] at a reconsideration hearing, and when a court gives "those

---

[31] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980), *superseded on other grounds by statute*, The Antitrust Procedural Improvements Act of 1980, Pub. L. No. 96-349, § 3, 94 Stat. 1154, 1156 (Sept. 12, 1980)).

[32] *Roadway Exp., Inc.*, 447 U.S. at 767.

[33] *In re Omni Video, Inc.*, 60 F.3d 230, 233 (5th Cir. 1995).

arguments full consideration in its order denying reconsideration,"[34] we have held that a party does "not suffer a denial of due process."[35]

Paine Snider had sufficient notice to satisfy due process. She knew that the hearing concerned sanctions—and that the court might impose them— because L-3's motion requested sanctions. She knew that dismissal specifically was a possible sanction because L-3's motion sought dismissal. She also knew from L-3's motion that L-3 had based its request for sanctions on perjury and withholding documents—the same misconduct the court used to justify its inherent-authority sanctions. L-3's motion put Paine Snider on notice about the factual basis for those allegations, and attorneys argued those facts extensively at the hearing.

Paine Snider also had an opportunity to be heard at the first sanctions hearing. The district court gave Paine Snider ample opportunity to make her arguments. Paine Snider's counsel argued against sanctions extensively, and he also suggested sanctions short of outright dismissal. The district court invited Paine Snider's attorney to present argument regarding imposition of inherent-authority sanctions. He declined and instead acknowledged the district court's inherent authority.

In any event, the motion to reconsider cured whatever due process concerns Paine Snider might have had about the initial hearing. The district court's 30-page order on the motion for reconsideration reflects that it gave Paine Snider's arguments full and adequate consideration. Accordingly, we cannot agree that Paine Snider's due process rights were violated.

---

[34] *Id.*
[35] *Id.*

No. 16-60731

## B

Courts possess the inherent authority to impose sanctions for misconduct and to protect the judicial process.[36]  We review a district court's imposition of sanctions for abuse of discretion.[37]  We do not decide "whether this [c]ourt, in its own judgment and as an original matter, would have imposed any of these sanctions."[38]

Dismissal with prejudice—the sanction at issue here—"is an extreme sanction that deprives a litigant of the opportunity to pursue his claim."[39]  We apply "particularly scrupulous" review to that sanction on appeal.[40]  Although the facts of each case determine whether dismissal is appropriate, we typically affirm a dismissal only if two conditions exist.[41]  First, there must be "a clear record of delay or contumacious conduct by the plaintiff."[42]  That is a factual finding that we review for clear error.[43]  Perjury is contumacious conduct that can satisfy the first condition.[44]  Second, dismissal is appropriate when "lesser sanctions would not serve the best interests of justice."[45]  The district court should show on the record that it considered lesser sanctions.[46]

---

[36] *See Chambers*, 501 U.S. at 50; *Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292-93 (5th Cir. 1997).

[37] *See Chambers*, 501 U.S. at 55 (first citing *Link v. Wabash R. Co.*, 370 U.S. 626, 633 (1962); and then citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399-405 (1990), *superseded on other grounds by* 1993 amendments to FED. R. CIV. P. 11); *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011) (per curiam) (first citing *Chambers*, 501 U.S. at 55; and then citing *Topalian v. Ehrman*, 3 F.3d 931, 934 (5th Cir. 1993)).

[38] *Brown*, 664 F.3d at 77 (quoting *Topalian*, 3 F.3d at 934).

[39] *Id.* (quoting *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1418 (5th Cir. 1995)).

[40] *Id.* (quoting *Brinkmann v. Dall. Cty. Deputy Sheriff Abner*, 813 F.2d 744, 749 (5th Cir. 1987)).

[41] *See id.* at 77-78.

[42] *Id.* at 77 (quoting *Sturgeon v. Airborne Freight Corp.*, 778 F.2d 1154, 1159 (5th Cir. 1985)).

[43] *Id.* (citing *Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010)).

[44] *Id.* at 78.

[45] *Id.* at 77 (quoting *Sturgeon*, 778 F.2d at 1159).

[46] *See id.* at 78-79.

No. 16-60731

Under these principles, the district court did not abuse its discretion when it dismissed Paine Snider's claims as a sanction. There was clear evidence of contumacious conduct and dismissal best served the interests of justice.

**1**

The district court did not clearly err when it found clear evidence of contumacious conduct that "undermined the integrity of the judicial process."[47] First, the court found that Paine Snider brought her Title VII claims in bad faith. It found that she conspired with Edwards and attempted to conceal his assistance in pursuing her claims. That finding was not clearly erroneous and finds ample support in the record.

Second, the court found that Paine Snider concealed material evidence during discovery. It found that Paine Snider failed to produce "voluminous emails, documents, and factual matters that would have revealed the assistance Edwards provided." That finding was not clearly erroneous. When Paine Snider was asked whether she had produced all of the emails and communications between her and Edwards, she testified that she had and that none had been deleted. L-3 later discovered over 3,000 emails sent to and from Paine Snider's personal email account that Paine Snider had not produced. Paine Snider argued that she interpreted that question to mean only emails that she possessed, and she says she did not possess the emails that L-3 later discovered. But the district court was not required to accept that explanation. Paine Snider had a motive to conceal these emails because they revealed the extent of her coordination with Edwards through their discussions about "legal advice," "scrubbing," and Paine Snider's "secret weapon." It was not clearly

---

[47] *Id.* at 78.

erroneous for the district court to conclude that Paine Snider attempted to conceal these emails.

Third, the district court found that Paine Snider had given inconsistent testimony under oath. That finding was not clearly erroneous. During a deposition in the Title VII litigation, Paine Snider testified that she "was not using Charles Edwards to assist [her]." When Paine Snider was later deposed in the North Carolina litigation initiated against her by Edwards's wife, Paine Snider testified that Edwards was the impetus for filing her discrimination claims and called him her "quarterback." Though reasonable minds can dispute how to characterize Paine Snider's original testimony, the district court did not clearly err in concluding that Paine Snider gave inconsistent testimony.

Finally, the district court spent considerable energy discussing Paine Snider's various ethical violations, including violations that may have occurred before the Title VII litigation. The court found that Paine Snider defied "her obligations as an officer of the court" and that Paine Snider's status as an ethics-bound attorney "merely amplifies the already clear and substantial record of contumacious conduct and abuse of the administration of justice." This finding was not clearly erroneous.

Paine Snider argued that because some of this contumacious conduct occurred before the Title VII litigation, the district court cannot use it to justify sanctions. Her argument is unavailing. First, the district court did not rely only on conduct that occurred before litigation. Second, Paine Snider's only legal authority for her proposition comes from outside this circuit and does not create the bright-line rule that Paine Snider envisions.[48] Prelitigation conduct that relates to "bringing, maintaining, or defending" the action is still subject

[48] *Towerridge v. TAO, Inc.*, 111 F.3d 758, 765 (10th Cir. 1997).

to sanctions.[49]   Certainly Paine Snider's alleged conspiracy with Edwards relates to bringing this litigation.  Additionally, a per se rule against sanctions for prelitigation conduct is inconsistent with the justifications for inherent-authority sanctions.  A court's inherent authority to impose sanctions serves goals beyond the specific litigation at hand.  It exists also to protect the integrity of the judicial process writ large.[50]  A court should be free to sanction conduct that undermines that process, whether it occurred during litigation or before it.  Any sanctions always remain subject to the two requirements of our review.

**2**

The district court did not abuse its discretion when it concluded that dismissal of Paine Snider's Title VII claim was the only appropriate remedy. After finding a clear record of Paine Snider's contumacious conduct, the district court expressly considered lesser sanctions, including re-deposing Paine Snider, reporting Paine Snider to the Mississippi Bar Association, or instructing the jury that Paine Snider had violated the Mississippi Rules of Professional Conduct.  But the district court was "not persuaded that a lesser sanction [would] serve as an appropriate penalty or deterrence for [Paine Snider] and others in the profession."  The district court concluded that a lesser sanction would do "nothing to address the shocking betrayal of ethical responsibilities perpetrated by [Paine Snider]" and would be "too minimal to offset such abuse."  "Dismissal with prejudice," the court said, "is the only proper response, especially considering that every aspect of [Paine Snider's] claims is now tainted by her abusive and contumacious conduct."  The district

---

[49] *Id.*; *accord Adkins v. Wolever*, 554 F.3d 650, 651-52 (6th Cir. 2009) (en banc) ("[A] federal court's inherent powers include broad discretion to craft proper sanctions for [pre-litigation] spoliated evidence").

[50] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-46 (1991).

court considered that these sanctions would allow L-3 to escape liability. Nonetheless, the court could not "permit an attorney to reap the awards of a successful litigation when that litigation is the product of the professional and fiduciary duties incumbent upon [Paine Snider] and Edwards."

Considering the district court's findings—that Paine Snider brought her Title VII claims in bad faith, concealed evidence, committed perjury, and violated her ethical responsibilities as an officer of the court—dismissing Paine Snider's claim was not an abuse of discretion. The district court satisfied both steps of our scrupulous review. There was contumacious conduct and the interests of justice were served only by dismissal with prejudice.

\* \* \*

We sum up our holding in this appeal. The district court did not err in granting summary judgment on statute of limitations grounds on L-3's claims that Edwards provided Paine Snider with legal assistance and that the Womble firm failed to disclose that legal assistance. We have further held that the district court did not err in dismissing Paine Snider's Title VII claims as a sanction for misconduct. We thus AFFIRM the district court's dismissal of these claims. We have held, however, that the district court erred in granting summary judgment with respect to L-3's claims regarding the legal assistance Edwards provided Wolf and Paine Snider's alleged misappropriation of confidential client documents. Because reasonable minds could differ as to whether the statute of limitations had run on those claims, summary judgment on statute of limitation grounds as to those claims was improper. We thus REVERSE the district court's dismissal of L-3's claims with respect to the legal assistance Edwards provided Wolf and REMAND as to those claims. We also REVERSE the district court's dismissal of L-3's claims with respect to the allegations that Paine Snider misappropriated confidential client documents and REMAND as to that claim. We thus AFFIRM the district court's judgment

in part, REVERSE in part, and only REMAND for further proceedings (1) L-3's claims against Womble and Edwards regarding advice or assistance to Janice Wolf and (2) Paine Snider's alleged misappropriation of confidential client documents.

AFFIRMED in part, REVERSED in part, and REMANDED.