# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 19, 2016

Lyle W. Cayce
Clerk

No. 15-50790

JUAN MENDEZ, SR., Individually and as Representative of the Estate of Juan Mendez, Jr., Deceased; SONIA SANCHEZ HERNANDEZ; CHRISTINA PENA RODRIGUEZ, Individually and as Next Friend of J.M. and C.M., Minors,

      Plaintiffs - Appellants

v.

TAYLOR POITEVENT; UNITED STATES OF AMERICA,

      Defendants - Appellees

---

Appeal from the United States District Court
for the Western District of Texas

---

Before JOLLY, CLEMENT, and OWEN, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

During an attempted arrest and the ensuing violent struggle, Juan Mendez, Jr., was shot to death by a Border Patrol Agent, Taylor Poitevent. Mendez's relatives sued Poitevent for, among other things, excessive force in violation of the Fourth Amendment. As relevant here, they also asserted various intentional tort claims against the United States. The district court held that Poitevent was entitled to qualified immunity, and thus granted him summary judgment. The district court also granted summary judgment for the

No. 15-50790

United States on plaintiffs' intentional tort claims. Plaintiffs appealed, and for the reasons below, we AFFIRM.

I.

On October 5, 2010, Border Patrol Agent Taylor Poitevent, uniformed and on-duty in Eagle Pass, Texas, heard a report over his service radio of potential alien or narcotics traffic near the Mexican border. The report described several individuals returning across the Rio Grande and several others in a white, single-cab pickup truck speeding in the opposite direction. Knowing the area described in the report to be an area commonly used by smugglers, Poitevent drove his marked vehicle to a location where he could intercept the truck, and parked. A white, single-cab pickup truck accelerated past his marked vehicle—an action that Poitevent interpreted as an attempt to flee. He pursued the truck into a residential cul-de-sac, where the truck's two passengers bailed out and began to run towards a fence.[1] In response, Poitevent bailed out as well and chased them on foot, shouting for them to get on the ground. On the opposite side of the fence, not far, was the Rio Grande. One of the passengers was able to climb the fence and escape; the other was Juan Mendez, Jr., an 18-year-old U.S. citizen whom Poitevent caught up with at the fence. Mendez resisted, and a struggle ensued.

Poitevent attempted to subdue Mendez by striking Mendez's thigh with his baton, but Mendez—later revealed to be high on cocaine and marijuana—continued to resist and to shove and hit Poitevent. Mendez also prevented Poitevent from radioing for help by pulling Poitevent's radio away from his mouth each time he attempted to use it. At some point during the struggle, Poitevent noticed that the holster guard on his service pistol had come undone,

---

[1] The truck was later found to contain 400 pounds of marijuana.

and he later testified that he "believed that Mendez was attempting to grab [his] pistol."

As the two tussled, several residents came out of their houses to see what was going on. Poitevent ordered them to go inside, but they remained outside.

Eventually, Mendez disarmed Poitevent of his baton. But Poitevent nevertheless brought Mendez to the ground, face-down, and struck him several more times while attempting to handcuff him. Mendez, however, managed to stand up with Poitevent on his back, so Poitevent put him in a chokehold.

Mendez slipped out of that hold and, as he did so, turned and struck Poitevent in the temple. Poitevent buckled, and later testified that he "saw black, felt weak, and feared that [he] was losing consciousness." (Later that day, Poitevent was diagnosed with a concussion and related symptoms.) He also testified that "[d]ue to Mendez's size advantage, strength, and aggression, as well as my exhaustion from the struggle, I feared losing consciousness and for my life," and that he "perceived Mendez as a threat" who "would not pass on the opportunity to kill me if I were unconscious." He reached out to grab Mendez by the belt, but again Mendez wriggled free. As Mendez was running towards the fence, Poitevent drew his service pistol and fired two shots, killing Mendez. According to Poitevent, he "stopped firing when [he] saw Mendez's silhouette go down." At the time Mendez was shot, he had run about 15 feet away from Poitevent, and both shots hit him.[2]

---

[2] The evidence is not entirely clear on where, precisely, the bullets struck Mendez. The medical examiner's report, according to the Texas Rangers' investigation report, indicated that one bullet struck him on the left side and the other struck him on the right side. One of the bystanders who witnessed the incident stated that he did not see the first shot strike Mendez and that he saw the second shot hit Mendez "on his side after he was already falling." That same bystander, however, stated that Mendez "had his back to the agent the entire time."

No. 15-50790

The Texas Rangers investigated the shooting and concluded that Poitevent "was clearly within his right to protect himself and others." Federal and state authorities both declined to prosecute Poitevent.

Mendez's relatives sued Poitevent[3] under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for excessive force in violation of the Fourth Amendment and for violating Mendez's Fifth Amendment rights. Mendez's relatives also sued the United States under the Federal Tort Claims Act, alleging both intentional tort claims and negligence claims. The two suits were eventually consolidated.

Poitevent and the United States each moved for summary judgment. The district court granted Poitevent's motion, concluding that he was entitled to qualified immunity on plaintiffs' Fourth and Fifth Amendment claims. The district court also granted the United States summary judgment on plaintiffs' intentional tort claims, but it denied the United States' related motion to dismiss plaintiffs' negligence claims. Plaintiffs later agreed to dismiss their negligence claims.

Plaintiffs appealed. They argue that the district court erred by granting Poitevent qualified immunity on their Fourth Amendment claim[4]; by granting the United States summary judgment on their intentional tort claims[5]; and by denying their motion to continue summary judgment in order to give them an opportunity to conduct discovery.

## II.

We review de novo a district court's grant of summary judgment. *See Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). We review a

---

[3] Plaintiffs initially sued other Border Patrol agents as well, but later dropped them from the case.

[4] Plaintiffs have abandoned their Fifth Amendment claim on appeal.

[5] Plaintiffs have also abandoned their negligence claims on appeal.

No. 15-50790

district court's order denying a request for discovery for abuse of discretion. *See Davila v. United States*, 713 F.3d 248, 263-64 (5th Cir. 2013).

III.

We first address plaintiffs' Fourth Amendment excessive force claim. Plaintiffs argue that the district court should not have granted Poitevent qualified immunity, and thus summary judgment, on that claim.

Law enforcement officers are entitled to qualified immunity for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). Courts must determine "whether a constitutional right was violated and whether the allegedly violated right was 'clearly established.'" *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). "At summary judgment, it is the plaintiff's burden to rebut a claim of qualified immunity once the defendant has properly raised it in good faith." *Cole v. Carson*, 802 F.3d 752, 757 (5th Cir. 2015). "This is a demanding standard." *Vincent*, 805 F.3d at 547.

"An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). This is an objective standard: The question is not whether the officer actually believed that the suspect posed a threat of serious harm but whether a "competent officer could have believed" as much. *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (explaining objective nature of inquiry). Courts do not analyze a use of force "with the 20/20 vision of hindsight," but rather "from the perspective of a reasonable officer on the

No. 15-50790

scene." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). The Supreme Court has cautioned judges against "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 132 S. Ct. 987, 991-92 (2012). That is because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff*, 134 S. Ct. at 2020 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). In determining the objective reasonableness of a use of force, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013). When deadly force is used, "the severity and immediacy of the threat of harm to officers or others are paramount to the reasonableness analysis." *Cole*, 802 F.3d at 758.

In light of the undisputed facts, a reasonable officer in Poitevent's situation could have believed that Mendez posed a serious threat of harm. In the moments leading up to the shooting, Mendez had struggled violently and aggressively against Poitevent. During that altercation, Mendez proved to be a dangerous opponent. Poitevent's initial attempts to subdue Mendez, including repeatedly striking Mendez with his baton, failed. Mendez then disarmed Poitevent of his baton and prevented him from calling for backup by repeatedly pulling away his radio. The strap on Poitevent's pistol holster came undone, leading him to believe that Mendez was attempting to grab the pistol. Mendez was physically strong enough to stand up with Poitevent on his back and to escape his grasp several times. Then, just before Poitevent shot Mendez, Mendez struck Poitevent in the temple, hard enough to concuss him. In that moment, it was reasonable for Poitevent—concussed, disoriented, weakened,

suffering a partial loss of vision, and fearing that he might lose consciousness in the presence of a violent suspected felon—to believe that Mendez might attempt to take advantage of his weakened or unconscious state to overpower and seriously injure or kill him. Mendez, an aggressive opponent who had proven his dangerousness, might—as Poitevent feared—have located the baton or another weapon, grabbed Poitevent's unsecured gun, or simply attacked Poitevent in an effort to secure his own escape or to conclude the fight. Poitevent also testified that at the time he shot Mendez, he saw only "Mendez's silhouette," even though Mendez was a mere 15 feet away, which is consistent with his testimony that after Mendez struck him, he "saw black . . . and feared that [he] was losing consciousness." Poitevent's disorientation may have prevented him from discerning whether Mendez was fleeing, regrouping, going for the baton, or even whether Mendez was in fact running away from him.[6] Considering all of the circumstances, we hold that Poitevent's use of deadly force was objectively reasonable.[7]

---

[6] In light of Poitevent's disorientation and partial loss of vision, that Mendez was unarmed and that he may have been shot in the back does not affect our conclusion. *Hudspeth v. City of Shreveport*, 270 F. App'x 332, 337 (5th Cir. 2008) (per curiam) (unpublished) ("That Hudspeth was unarmed is also irrelevant. That Hudspeth had his back to the Officers at the instant deadly force was used is also irrelevant." (internal citation omitted)). Any dispute over whether Mendez was shot in the back or in the side is not material here—at the moment Mendez was shot, Poitevent could not perceive whether Mendez was retreating or instead seeking a weapon in order to take advantage of Poitevent's vulnerable state. *See Mahler v. Kaylo*, 537 F.3d 494, 504 (5th Cir. 2008); *Colston v. Barnhart*, 130 F.3d 96, 100 (5th Cir. 1997). And although Poitevent did not issue a warning before shooting Mendez, it was not feasible to do so under the "tense, uncertain, and rapidly evolving" circumstances that Poitevent faced. *Graham*, 490 U.S. at 397; *see Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (officer who determines that deadly force is necessary to protect himself or others should give warning "where feasible").

[7] Plaintiffs dispute that Poitevent actually believed that he was threatened. But "the proper inquiry is an *objective* one"; Poitevent's subjective beliefs are "irrelevant." *Hudspeth*, 270 F. App'x at 337 ("[A]lso irrelevant are the Officers' *subjective* beliefs provided by the testimony but not shown by the videotapes, namely whether any of the Officers truly thought: Hudspeth had a gun; their lives were in danger; or, Hudspeth was pointing the device (whether gun or cell phone) *at* an Officer.").

Indeed, this case is analogous to *Colston v. Barnhart*, 130 F.3d 96 (5th Cir. 1997). There, this court held that an officer's use of deadly force was objectively reasonable. The suspect in *Colston* similarly disobeyed officers' orders to get on the ground, "violently and forcefully resisted the officers' attempts to gain control of him," knocked the officers on the ground "with some force," and "dazed" an officer and blurred his vision. *Id.* at 99. That officer's "earlier attempts to control [the suspect] with non-deadly force, including hitting him with a baton," just like Poitevent's attempts, "had failed." *Id.* And the victim, like Mendez, was "in a position to inflict serious harm on the officers with or without a weapon." *Id.* at 99-100. The court in *Colston* also found it salient that the officer "had no way to know whether" the suspect—who asserted that he was attempting to flee at the time he was shot—"intended to flee or inflict further injury or death on the officers." *Id.* at 100. Nor did Poitevent.

Plaintiffs attempt to distinguish *Colston*, arguing that "it was clear that the plaintiff [in *Colston*] was physically larger than the officer, that he knocked two officers down, that the plaintiff was standing between the two officers who were on the ground, that the plaintiff was in a position to injure the officers, and the officer who discharged his weapon reasonably believed that the suspect was going toward the patrol car where the officer knew there was a shotgun." Yet those are slight distinctions: Here, Mendez was similarly in a position to injure or kill the disoriented and visually impaired Poitevent, who feared that he was losing consciousness. And a reasonable officer in Poitevent's position would reasonably believe that Mendez, even if Poitevent could discern that Mendez was moving away, posed a threat, either by coming back at Poitevent or seeking another weapon—such as the baton.

Plaintiffs also argue that the only relevant facts for our consideration are that, at the time of the shooting, Mendez had broken free, was running away

from Poitevent, and had covered 15 feet. But we must consider all of the circumstances leading up to that moment, because they inform the reasonableness of Poitevent's decisionmaking. *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 493 (5th Cir. 2001); *see Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (noting that officer's conduct "must be judged in light of the circumstances confronting him"). In other words, the question here is not, as plaintiffs assert, whether an officer violates the Fourth Amendment by shooting a suspect who is running away. Rather, it is whether an officer violates the Fourth Amendment by shooting a suspect who just fought the officer at length; disarmed him of his baton; prevented him from using his radio to call for backup; potentially attempted to obtain his gun; concussed and disoriented him; and broke free of his grasp; at the precise moment the officer's vision is impaired and he fears losing consciousness—and the evidence indicates that it was not apparent to Poitevent that Mendez was running away. In our view, using deadly force in such circumstances does not violate the Fourth Amendment.

Next, plaintiffs argue that the district court should not have credited Poitevent's statement that he feared he was losing consciousness and that it should not have concluded that Poitevent suffered a concussion. But the only evidence in the summary judgment record was that he did fear that he was losing consciousness and that he did suffer a concussion. Plaintiffs did not submit any evidence to the contrary, and their bare skepticism cannot create a dispute of fact. *See Ontiveros v. City of Rosenberg*, 564 F.3d 379, 383 (5th Cir 2009); *see also Squyres v. Heico Cos.*, 782 F.3d 224, 230-31 (5th Cir. 2015). Plaintiffs similarly argue that the district court should not have accepted Poitevent's assertion that Mendez had a "size advantage" because Poitevent's own physical dimensions are not in the record. Again, the only evidence in the

record—Poitevent's assertion—is uncontradicted, not, as plaintiffs contend, unsupported.

Plaintiffs additionally contend that the district court should not have relied on the fact that Poitevent suspected Mendez of committing a "serious drug trafficking offense," arguing that Poitevent did not know whether the offense was serious or that it related to drugs, not aliens. Although plaintiffs are correct that Poitevent never stated as much, whether the district court relied on that purported fact or not is immaterial. Our review is de novo and, even without relying on Poitevent's purported suspicions, his actions were objectively reasonable, as discussed. And in any event, Poitevent suspected— based on the radio report and his knowledge that the area was often used by smugglers—either narcotics or alien trafficking.

In sum, we hold that Poitevent did not use excessive force because a reasonable officer in his situation could have believed that Mendez posed a threat of serious harm, justifying the use of deadly force. Thus, we affirm the district court's grant of qualified immunity.

IV.

We next turn to plaintiffs' argument that the district court erred in granting summary judgment for the United States on their intentional tort claims under the Federal Tort Claims Act. The FTCA provides a limited waiver of sovereign immunity for certain tort claims against the United States. *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 251-52 (5th Cir. 2006) (en banc). On those claims, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. And the "law of the place where the act or omission occurred" governs liability in FTCA cases. 28 U.S.C. § 1346(b)(1). Thus, Texas law applies here. Against plaintiffs' intentional tort claims arising under Texas law, the United States asserted Texas's "civil privilege" defense. Tex. Penal Code § 9.51. Under

that defense, if conduct is privileged, then it is not tortious. *Hinojosa v. City of Terrell*, 834 F.2d 1223, 1231 (5th Cir. 1988).

The district court held that the United States was not liable on plaintiffs' intentional tort claims because Poitevent's use of force was privileged. Plaintiffs contend that the United States cannot invoke the civil privilege defense and, even if it could, that genuine disputes of material fact remain on whether Poitevent's conduct meets the requirements of the civil privilege defense. We address each argument in turn.

a.

Plaintiffs assert two arguments as to why the United States cannot invoke the civil privilege defense here. Each fails.

First, plaintiffs point out that under the FTCA, the United States must be treated as a private person notwithstanding the "uniquely governmental functions" performed by its employees, *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955), and that as a result courts must look to "the state-law liability of private entities, not to that of public entities," *United States v. Olson*, 546 U.S. 43, 46 (2005). Thus, in examining FTCA claims, courts must determine whether a private person would be liable for the conduct in which the United States' employees engaged. So, for example, the United States may not invoke immunity defenses available only to governmental entities. *Villafranca v. United States*, 587 F.3d 257, 262-264 (5th Cir. 2009). In plaintiffs' view, Texas's civil privilege defense is available only to public officials, and thus the United States cannot invoke the defense—the United States is liable as if it were a private person, not a public official. Put another way, plaintiffs view the civil privilege defense as an immunity that would not be available to a private person, and thus the United States may not assert it.

Yet—as plaintiffs concede—this court confronted and rejected this precise argument in *Villafranca*, 587 F.3d at 262-264. There, this court held

that the United States "can invoke [Texas's civil privilege defense] for its law enforcement officers." *Id.* at 264; *see also Davila v. United States*, 713 F.3d 248, 261-62 (5th Cir. 2013) (same). The court distinguished privileges from immunities and noted that "an individual, acting under color of state law, . . . could invoke the § 9.51 privilege to avoid personal liability under Texas law." *Villafranca*, 587 F.3d at 264.

We are bound by the *Villafranca* and *Davila* panels' holdings under the rule of orderliness. *United States v. Alcantar*, 733 F.3d 143, 145-46 (5th Cir. 2013) (explaining rule of orderliness). There has been no intervening change in the law—let alone an "unequivocal" one—that would permit us to decline to follow those holdings. *Id.* We thus reject plaintiffs' argument that the United States may not invoke Texas's civil privilege defense.

Second, plaintiffs argue that federal Border Patrol Agents, like Poitevent, are not "peace officers" under Texas law and thus that section 9.51 does not apply. Section 9.51(c) privileges the use of deadly force by "peace officers," and another section of the Texas Penal Code, § 1.07(a)(36), defines "peace officer" as "a person elected, employed, or appointed as a peace officer under Article 2.12, Code of Criminal Procedure, Section 51.212 or 51.214, Education Code, or other law." Plaintiffs point out that Article 2.12 of the Code of Criminal Procedure does not list Border Patrol Agents as "peace officers," and that Article 2.122(c) provides that a Border Patrol Agent "is not a peace officer under the laws of this state." Thus, plaintiffs maintain, a Border Patrol Agent is not a peace officer for purposes of section 9.51(c).

This argument, too, is expressly foreclosed by *Villafranca* and *Davila*. In *Davila*, this court held that "[f]ederal officers are peace officers for the purpose of the Texas criminal assault statute and its civil privilege defense." 713 F.3d at 261; *see Villafranca*, 587 F.3d at 264 (similar). Indeed, in *Davila*, the court held that National Park Service Rangers were entitled to assert the civil

privilege defense, even though Article 2.122(d) of the Texas Code of Criminal Procedure similarly provides that a National Park Service officer "is not a peace officer under the laws of this state." *See* 713 F.3d at 261-62.

Citing *De La Paz v. Coy*, 786 F.3d 367 (5th Cir. 2015), plaintiffs counter that we are not bound under the rule of orderliness by *Villafranca* or *Davila* because the court purportedly did not consider, in either case, plaintiffs' specific arguments. But plaintiffs are incorrect. *De La Paz* does not stand for the proposition that the rule of orderliness may be skirted where a party dreams up new arguments that were not presented to a prior panel. Instead, there, this court simply rejected an assertion that it was bound by certain prior panel decisions—those decisions did not address the issue at hand. *See id.* at 373-75. And in *Davila*, the court explicitly held that "[f]ederal officers are peace officers for the purpose of the Texas criminal assault statute and its civil privilege defense"; had it not, it could not have permitted the United States to use that defense to avoid liability. 713 F.3d at 261.

b.

Next, plaintiffs argue that even if the United States may assert the civil privilege defense here, genuine disputes of material fact exist as to whether Poitevent's conduct was privileged. In particular, plaintiffs dispute whether Poitevent "reasonably believe[d] that there [wa]s a substantial risk that [Mendez] w[ould] cause death or serious bodily injury to [him] or another if the arrest [wa]s delayed," and thus that Poitevent "reasonably believe[d] th[at] deadly force [wa]s immediately necessary to make an arrest." Tex. Penal Code §§ 9.51(c)(2), 9.51(c). This, like our Fourth Amendment inquiry, involves an objective standard. *Texas Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 579 (Tex. 2001). For the reasons discussed at length above, we hold that Poitevent could have reasonably believed that there was a substantial risk that Mendez would cause death or serious bodily injury to him or another person if the arrest was

delayed, and that he could have reasonably believed that deadly force was immediately necessary to make an arrest. *See Ramos v. State*, No. 03-12-00302-CR, 2014 WL 2957742, at *4 (Tex. App.—Austin June 26, 2014) (mem. op., not designated for publication) (treating section 9.51 inquiry as coterminous with Fourth Amendment inquiry).

\* \* \*

In light of the foregoing, we affirm the district court's grant of summary judgment for the United States on plaintiffs' intentional tort claims.

V.

Plaintiffs also contend that the district court abused its discretion in ruling on defendants' motions for summary judgment before discovery, implicitly denying plaintiffs' request for a continuance to conduct discovery. Plaintiffs bore a heavy burden below because they sought discovery "to disprove the applicability of an immunity-derived bar to suit because immunity is intended to shield the defendant from the burdens of defending the suit, including the burdens of discovery." *Freeman v. United States*, 556 F.3d 326, 342 (5th Cir. 2009). Courts are authorized under Rule 56(d) to defer ruling on a summary judgment motion and allow discovery, but "Rule 56 does not require that *any* discovery take place before summary judgment can be granted." *Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 756 (5th Cir. 2005) (quoting *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir. 1990)). And under Rule 56(d), deferring summary judgment and ordering discovery is appropriate only if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). A party "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013).

No. 15-50790

Plaintiffs' affidavit here fell short. Plaintiffs' counsel alleged that they had no opportunity to depose Poitevent and the witnesses to the shooting. In support of the motion, counsel asserted that "[t]he testimony of these witnesses and others bear[s] upon the acts and omissions of Taylor Poitevent, and the reasonableness of his conduct in shooting Juan Mendez, Jr." But plaintiffs did not identify below any reason why it could not obtain the testimony of the witnesses to the shooting through, for example, affidavits; indeed, plaintiffs submitted a declaration from one of them. And the witnesses' accounts were already incorporated into the record through the Texas Rangers' investigation report. In addition, Poitevent himself submitted his own testimony. Plaintiffs presented no reason why either Poitevent's affidavit or the witness accounts in the investigation report were insufficient, and their contention that summary judgment was inappropriate before they were able to depose Poitevent is unsupported. *See Baker*, 430 F.3d at 75; *see also Freeman*, 556 F.3d at 342. Plaintiffs did not, moreover, identify specific facts below that would alter the district court's analysis. *See Biles*, 714 F.3d at 894. Instead, they vaguely assert before this court that deposing the witnesses would have "permitted [plaintiffs] to further discover the facts from the witnesses who saw the scuffle." In other words, plaintiffs did not demonstrate below "how the additional discovery [would] likely create a genuine issue of material fact." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 535 (5th Cir. 1999). Instead, the result of the discovery they sought was "wholly speculative." *Robbins v. Amoco Prod. Co.*, 952 F.2d 901, 907 (5th Cir. 1992).[8]

---

[8] On appeal, plaintiffs contend that discovery regarding whether Poitevent actually suffered a concussion, and the extent of that concussion, would produce evidence material to their opposition. But in this context, this court does not "consider justifications for granting a continuance that were not presented with the original motion," and plaintiffs did not present this justification below. *Stearns*, 170 F.3d at 535.

15

No. 15-50790

We thus hold that the district court did not abuse its discretion in implicitly denying plaintiffs' motion for a continuance to conduct discovery.

## VI.

For the foregoing reasons, we AFFIRM the district court's orders granting Poitevent and the United States summary judgment.