# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 5, 2025

Lyle W. Cayce
Clerk

———————

No. 22-10514

———————

Silvia Garcia Rodriguez, *as Administrator of* the Estate of Marco Antonio Galvan and *Individually on behalf of* all Statutory Death Beneficiaries of Marco Antonio Galvan, and *as Next of Friend to* MMGG,

*Plaintiff—Appellant*,

*versus*

Blaine Larsen Farms, Incorporated,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:21-CV-52

———————————————————————

Before King, Jones, and Duncan, *Circuit Judges*.

Per Curiam:[*]

Blaine Larsen Farms hired Marco Antonio Galvan to work at its Dalhart property for a fixed period of time that began in July 2020. Galvan succumbed to complications from COVID less than three weeks after he

———————————————

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

moved from Mexico to live and work at the farm. His widow sued in her capacity as administrator of his estate and on behalf of all legal beneficiaries in Texas state court under theories of negligence, negligent entrustment, gross negligence, breach of contract, wrongful death, survival, and loss of consortium. The district court granted the employer's motion for summary judgment in full. It also denied the plaintiff's motion to alter or amend the judgment. We AFFIRM.

## I. BACKGROUND

We begin with a summary of the evidence that was presented in the district court. Blaine Larsen Farms ("BLF") operates a potato farm and processing facility in Dalhart, Texas. BLF hired Mexican national Marco Antonio Galvan for temporary work at its farm through the H-2A visa program for agricultural workers.[1] Galvan arrived at BLF's Dalhart facility on July 2, 2020. Abenicia Lozano ("Lozano"), a BLF human-resources employee, met with Galvan sometime shortly thereafter. Explaining the housing policies that would apply for the duration of his employment, Lozano informed Galvan that BLF would transport him into "the town" (*i.e.,* Dalhart) if he needed anything. According to Lozano, a "bus was always available."

Galvan's wife, Sylvia Rodriguez, remained in Mexico when Galvan moved to Dalhart. On July 10, Galvan informed her that he was experiencing a sore throat, cough, chills, and fever. On July 14, Galvan asked a human-resources employee whether he could return to Mexico to recover. Lozano recalled during her deposition a call with Galvan and his roommate that took place around that same time. Galvan sat nearby as Lozano spoke with the roommate over speaker phone. The roommate told Lozano that Galvan felt

---

[1] *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

tired and might be experiencing a "little fever and cough." Galvan did not add anything. Lozano wrote down the symptoms and called a clinic, seeking guidance with respect to what steps "needed to [be] take[n]."

After speaking with the clinic, human resources arranged for Galvan, Jose Guadalupe Navarro Castro ("Guadalupe"), and Cesar Martin Carranza Saucedo ("Saucedo"), each of whom were BLF employees experiencing COVID symptoms, to be driven in a company vehicle and tested for COVID at Coon Memorial Hospital on July 15. Guadalupe and Saucedo each testified to the promptness of BLF's response. Per Saucedo, after informing his supervisor that he "was feeling sick" and "couldn't continue [his] work," the "supervisor gave the orders to the person that was there from the main office" to transport Saucedo for a COVID test. Guillermo Rosas, another BLF employee, testified that he "made a comment" to his supervisor about how he "was feeling a little bit sick," and he wanted "to go get tested for COVID," and the supervisor notified BLF staff, who arranged for the test "at that moment." Rosas further testified, and it is not clear whether this incident was related to his COVID infection or a separate incident, that when he reported symptoms of chest pain and arm numbness to Lozano, "it was a matter of minutes when they told [him] that they were taking [him] to the emergency room."

Dr. Matthew Turner from Coon Memorial diagnosed Galvan with COVID based on a positive test result. The trio of BLF employees returned to the BLF property after getting tested and were told to quarantine in Trailer Number Four until cleared. There, the group remained "together all the time." They stayed in regular contact with their respective families. Saucedo testified that he communicated on July 15 with his mother. Guadalupe reported speaking with his wife. Saucedo observed Galvan "speaking on his own cell phone. Each one of [them] ha[d] his own device."

Shortly after Galvan entered Trailer Number Four, Lozano spoke with him over the phone. Lozano told Galvan that he could expect people to be in regular contact, checking on his wellbeing and inquiring whether he needed groceries or medicine. Other testimony seems to corroborate this practice. Guadalupe testified that he heard from his "supervisor" "about every other day." A BLF employee quarantined in another trailer, Jose Gaudalupe Herrera Villegas, testified that BLF was "always in communication," calling those infected with COVID "every single day" to "check" on them, and asking those infected how they felt and whether they needed anything.

In addition to these check-ins from BLF, the employees reportedly received phone calls from the facility where they had been tested for COVID. Guadalupe, for instance, testified that hospital personnel would sometimes call Saucedo but "would ask for each one of [them], those of [them] who were at the trailer." Saucedo testified that at other times the hospital would call Guadalupe, "ask[ing] to talk to each one of the persons who were there." Rosas, who eventually joined the trio in Trailer Number Four, testified that "the clinic," for the most part, "would call [them] daily asking [them] about the symptoms, and how [they] were doing," and on days when the clinic did not call, it would email the employees. Specifically, Guadalupe recalled seeing Galvan speak with the clinic "[l]ike two times." During the first conversation, Guadalupe passed Galvan the phone and, before Galvan walked outside, Guadalupe overheard him telling the hospital staff on the other end of the line that "all [was] good." And during the second conversation, which took place while Galvan remained lying in his bed, Guadalupe overheard Galvan telling the hospital staff that "he only had a little bit of cough."

An official document from BLF, entitled "Procedures for COVID H2A Workers," is consistent with everyone's testimony. The document

outlines eleven steps with respect to potential employee COVID infections: (1) Check for symptoms; (2) contact Dr. Turner or his nurse Stacy Bonds; (3) send order for testing to the hospital; (4) bring employee to the hospital for testing; (5) call the hospital for results if not received within six hours; (6) isolate employees while waiting for results and quarantine their entire house if an employee tests positive; (7) isolate positive employees together; (8) check with the doctor every day for a release letter; (9) tell quarantined and positive employees to call BLF staff if they need anything; (10) BLF staff continue to regularly contact the quarantined employees to check on them and see if they need anything; and (11) BLF staff leave requested provisions on the porch of a quarantined trailer.

The record reflects that quarantined employees were not stranded without supplies. Guadalupe testified that he purchased cough syrup. As he explained, "[a]fter [they] left from getting the [COVID] test each one of [them] went to buy whatever medicine [they] were going to use." Galvan was present for this excursion. Moreover, Saucedo, Guadalupe, and Rosas took aspirin and Tylenol during their quarantine, which Saucedo claimed "would help [them] a little bit," but Saucedo did not really pay attention to whether Galvan took medication or received any special medical treatment. According to Saucedo, the doctors who saw the roommates recommended "just to take aspirin or Tylenol."

Saucedo testified that in the few days that he was quarantined with Galvan, they "had everything [they] needed to be. [They] had meat. [They] had all the supplies. [They] were not in need of any water. [They] had everything to continue living there." Saucedo did not observe anyone in the trailer drinking water from the tap because they "had bottled water." Rosas testified to a similar experience. Specifically, Rosas testified that when he first arrived at the quarantine trailer, "there was meat, soup, fruits, yogurt," "food [he] could prepare," "Gatorade, water, and sodas."

On July 19, Saucedo's father brought "some supplies" and "pizzas" for the quarantined roommates to share with each other. The following morning, Saucedo was awoken around 6 a.m. when Galvan, who was nearby and propped up in bed with a cell phone in one hand, spilled some water from a bottle that he had been holding in his other hand. Saucedo fell back asleep and woke up hungry around 9 a.m. After rising from bed and briefly meeting with Guadalupe and Rosas in the kitchen, Saucedo returned to the bedroom that he shared with Galvan, "told [Galvan], come on over, we're going to have breakfast, and [Galvan] said, yes, I'll be right there."

As Saucedo walked back to the kitchen, he heard Galvan cough. Rosas, who remained in the trailer, described Galvan's cough as "louder, more pronounced than usual," and explained that Galvan seemed to be "having a hard time breathing." But Rosas also testified that Galvan never told him that he needed medical attention. BLF's human-resources representative, Sherri Elliott-Yeary, likewise testified that Galvan had never "ask[ed] for medical help." And Saucedo testified that Galvan's cough had not "present[ed] a problem" before that morning. Nevertheless, in light of Galvan's deteriorating condition, Saucedo asked Rosas to call BLF staff so that they could check on Galvan.

Rosas phoned the BLF office, informed Lozano and another employee, Michelle Andrade, that Galvan "had gotten sicker," and requested immediate assistance, including an ambulance. "[I]t was, like, a minute, maybe less than a minute" when Saucedo "received a call from the person who was in charge of human resources[,] [Lozano]." Lozano asked Saucedo "what was going on," and told Saucedo that an ambulance had already been called. Another BLF employee raced to Trailer Number Four, as Saucedo put it, "so that the ambulance would get there sooner and the whole transfer would be made faster." Lozano testified that BLF general

6

manager Antonio Huaracha, Andrade, and another BLF employee, Bridger Talbot, soon made their way to Trailer Number Four.

Meanwhile, still on the phone with BLF's office, Saucedo told Lozano that Galvan "was coughing and it was a cough that wouldn't go away." Saucedo testified that Galvan "suddenly" "stopped coughing" and "stopped moving" shortly before the ambulance arrived. Saucedo tried to "see if [Galvan] still had a pulse," but he "really wasn't sure." It was "maybe a minute" later when the ambulance arrived. Tragically, however, it was too late. The paramedics pronounced Galvan dead at the scene.

These facts are gleaned from depositions and other evidence in the record. The court assumes that the facts are an accurate reflection of what transpired. Plaintiff has not cited any evidence in the record that contradicts these facts. Nor do they contend that these facts are wrong. And the court for good measure has reviewed the parts of the record available to it, finding no contradiction.

## II. PROCEDURAL HISTORY

Plaintiff Sylvia Rodriguez is Galvan's widow and the administrator of Galvan's estate. In that capacity, and on behalf of Galvan's legal beneficiaries, she sued BLF in state court for negligence, negligent entrustment, gross negligence, loss of consortium, wrongful death, survival, and breach of contract. BLF promptly removed this case to federal court on diversity grounds. After extensive briefing, the district court granted BLF summary judgment on all claims. *See Rodriguez v. Blaine Larsen Farms, Inc.*, 2022 WL 484924 (N.D. Tex. Feb. 15, 2022). Plaintiff moved to alter or amend the judgment. The district court denied her motion. *See Rodriguez v. Blaine Larsen Farms, Inc.*, 2022 WL 18034478 (N.D. Tex. Apr. 21, 2022). Plaintiff filed this appeal.

No. 22-10514

During oral argument, the court was informed of a related matter pending before the Texas Division of Workers' Compensation ("Division"). To preserve judicial resources, and because a finding that Galvan's death was employment-related could result in workers' compensation benefits, the court placed this appeal in abeyance and directed counsel to keep the court apprised of any developments in the Division's administrative process. On December 16, 2024, plaintiff's counsel provided a major update: An administrative law judge ("ALJ") found that Galvan did not sustain a "compensable injury" in the form of an "occupational disease" within the scope of the Texas Workers' Compensation Act ("TWCA"). Plaintiff's counsel indicated their intent to appeal that decision. On March 17, 2025, plaintiff's counsel provided another update: the administrative appeals panel affirmed the decision of the ALJ. This court directed the parties to file supplemental letter briefs articulating their views as to the impact of those decisions. The supplemental letters were filed soon after and voiced different recommendations. Plaintiffs recommended continued abatement of the entire suit pending judicial review of the workers' compensation eligibility by Texas courts. BLF recommended that the court affirm summary judgment. We opt for the latter solution.

## III. STANDARD OF REVIEW

The district court's grant of summary judgment will not be disturbed so long as this court concludes, reviewing the issues de novo, that "there is no genuine dispute as to any material fact," and that BLF "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The parties' principal briefs, like the district court's decision, focus on whether BLF "is entitled to judgment as a matter of law." BLF argues it "is entitled to judgment as a matter of law" because plaintiffs' claims are barred by the Texas Pandemic Liability Protection Act ("PLPA") and the

8

TWCA. Plaintiffs primarily counter that these statutes do not preclude relief on these facts—at least as to their gross negligence claim. In light of careful record review, however, and questions about the scope of both statutes, we will move on to assess the substantive tort and contract claims, which both parties have briefed. So doing, we find an "absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) ("[R]ule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *United States v. Hernandez*, 647 F.3d 216, 218 (5th Cir. 2011) ("The panel may affirm the district court's decision on any basis established by the record." (internal quotation mark and citation omitted)).

## IV. DISCUSSION

The district court granted summary judgment to BLF on the basis that plaintiff's claims cannot overcome the TWCA or PLPA.[2] We consider each of these statutes in turn. What ultimately proves decisive is that plaintiff failed to submit evidence to raise genuine material fact issues in support of multiple tort and contract claims.

### 1.

BLF relies on the exclusivity of workers' compensation benefits for employers who carry Texas workers' comp insurance. The TWCA provides

---

[2] Specifically, the TWCA includes an express carve-out for gross negligence claims, so it is solely plaintiff's other claims that could be foreclosed by the TWCA. Tex. Lab. Code § 408.001(b). The district court held that *all* of plaintiff's claims are barred by the PLPA.

"the exclusive remedy of (1) an employee covered by workers' compensation insurance coverage (2) against the employer . . . (3) for a work-related injury [or death] sustained by the employee (i.e., injury in the course and scope of employment)." *Berry Contracting, L.P. v. Mann*, 549 S.W.3d 314, 321 (Tex. App.—Corpus Christi-Edinburg 2018) (citing Tex. Lab. Code § 408.001(a)). *See also Payne v. Galen Hosp. Corp.*, 28 S.W.3d 15, 19 (Tex. 2000) ("We have never decided whether an injury arising in the course and scope of employment for compensation purposes is necessarily 'work-related' for exclusivity purposes. . . . Courts seem to use the terms 'course and scope of employment' and 'work-related' interchangeably."); *Univ. of Tex. Rio Grande Valley v. Oteka*, --- S.W.3d ---, 2025 WL 1668315, at *2 (Tex. 2025) (noting that where defendant asserted an exclusive-remedy defense it "placed in dispute whether [plaintiff's] injury occurred in the course and scope of her employment and was thereby work-related"). The district court, largely relying on what it deemed judicial admissions in the complaint and motion to remand, held that Galvan's injury was work related and therefore workers' compensation was the exclusive remedy.

Whether the court's ruling on judicial admissions is correct, we need not decide. Nor, although we have jurisdiction to do so,[3] need we decide at this point whether the TWCA offered the only possibility of recovery for

---

[3] Plaintiff contended that the Division has exclusive jurisdiction to determine whether an injury or death occurred in the course and scope of employment, citing *In re Tyler Asphalt & Gravel Co.*, 107 S.W.3d 832, 839 (Tex. App.—Houston 2003). This position has been overruled by the Texas Supreme Court. *Univ. of Tex. Rio Grande Valley*, S.W.3d, 2025 WL 1668315, at *5. Moreover, the question whether an injury occurred in the course and scope of employment has been treated as a legal question reviewable de novo. *See SeaBright Ins. Co. v. Lopez*, 465 S.W.3d 637, 643 (Tex. 2015) (citing *Tex. Emp. Ins. Ass'n v. Inge*, 208 S.W.2d 867, 867 (Tex. 1948) ("[T]he only matters in dispute were legal questions whether Inge, at the time of his death, was acting in the course of his employment.")).

Galvan's estate from BLF.  That the administrative decision determined his illness was not work-related under TWCA is not a final decision that is preclusive on this court, but it is persuasive.  If the illness is not covered, then there is a question whether he can sue his employer in tort and contract for non-work-related matters.  Even if the illness were covered, however, the TWCA exempts from exclusivity any employment-related injury claims based on gross negligence.  Tex. Lab. Code § 408.001(b).  Either way, the factual viability of Galvan's tort and contract claims ultimately has to be analyzed.

**2.**

BLF also relied on the PLPA, enacted after Galvan's death but made retroactively applicable by the Texas legislature.  The PLPA protects companies from liability "for injury or death caused by exposing an individual to a pandemic disease during a pandemic emergency" unless the plaintiff can produce "reliable scientific evidence" that shows a certain failure by the company (*i.e.*, a failure to warn that COVID exposure was likely, or failure to implement or comply with public health standards) "was the cause in fact of the individual contracting the disease."  Tex. Civ. Prac. and Remedies Code § 148.003(a)(1)–(2).  Plaintiff failed to produce the sort of "reliable scientific evidence" contemplated by the PLPA.  That failure, and the district court's conclusion that COVID was a "proximate cause" of Galvan's death, compelled the district court's holding that the PLPA bars plaintiff's claims.

This court has applied the PLPA in the more conventional context where a plaintiff sought relief *for their alleged exposure* to COVID.  *See In Johnson v. Tyson Foods*, 2023 WL 2645553, at *3 (5th Cir. Mar. 27, 2023) (holding that "[w]ithout allegations connecting Plaintiffs' individual contraction of COVID-19 to both Tyson's facility and failures [to provide

remedial measures], Plaintiffs' allegations fail" to withstand the *Iqbal* standard). But that is not the case here. Plaintiff maintains that her claims relate to inadequate medical treatment rather than BLF's exposing Galvan to COVID. Neither this court nor the Texas Supreme Court has passed on whether the PLPA immunizes an employer in this unique context where (1) a company might or might not have exposed an employee to COVID; (2) that exposure might be a but-for and proximate cause of the person's death; and (3) a plaintiff seeks relief on other grounds than for the exposure to COVID. This case may not be covered by the statute. In any event, the record lacks evidence probative of whether Galvan was actually infected with COVID *after* he arrived at BLF's farm. Given the uncertainties, we decline to definitively rule whether the PLPA bars relief.

**3.**

Plaintiff's negligence-based claims require her to prove that BLF violated a legal duty. *See Greater Hou. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) ("The common law doctrine of negligence consists of three elements: 1) a legal duty owed by one person to another; 2) a breach of that duty; and 3) damages proximately resulting from the breach."). "Whether a duty exists in a negligence case is a question of law for the court to decide from the facts surrounding the occurrence in question." *Advance Tire & Wheels, LLC v. Enshikar*, 527 S.W.3d 476, 480 (Tex. App.—Houston [1st Dist.] 2017) (citation omitted). Plaintiff's negligence claims fail to raise a genuine dispute of material fact as to duty or breach of duty on the evidence before this court.

First, plaintiff contends that BLF acquired a heightened legal duty when it "undertook to quarantine Mr. Galvan." This argument largely tracked plaintiff's allegation in her original petition that when BLF "required Mr. Galvan to remain in quarantine housing on its isolated

property," BLF "undertook a duty to monitor and ensure Mr. Galvan's access to medical care to treat his COVID-19 symptoms." We construe this as a "negligent-undertaking" claim. Plaintiff's claim relies on a line of Texas case law recognizing that "one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby." *Tex. Woman's Univ. v. The Methodist Hosp.*, 221 S.W.3d 267, 283 (Tex. App.—Beaumont 1999) (internal quotation mark and citation omitted). Specifically, plaintiff contends that "the Texas case *Baker v. Adkins* is extremely analogous, and therefore, instructive."

In that case, a railway employee afflicted with smallpox was placed in a rail car to recover. *Baker v. Adkins*, 278 S.W. 272, 273 (Tex. App.—San Antonio 1925, writ ref'd). His wife and children were "kept in ignorance of his sickness" "for a while," and when finally informed, the wife was ordered not to visit him. *Id.* at 275. Thus, the decedent was truly "helpless," with the employer "assum[ing] absolute control over the life and destiny of the sick [employee]." *Id.* The court concluded that in such extreme circumstances, where an employer assumes complete responsibility for medical care and attention to its sick employee, "to the exclusion of the family or other agencies, it will be held to the exercise of reasonable care in giving such aid." *Id.* at 276.

This case is completely different. Galvan and other BLF employees were promptly transported to Coon Memorial Hospital for COVID testing and remained in regular contact with BLF and hospital staff. The quarantined employees had access to essentials including food, Tylenol and aspirin, and cough syrup. The employees remained in contact with families via their cellphones, and one roommate's family member paid a visit. When it appeared that Galvan's condition had worsened, the company immediately called for medical help. The uncontested facts show that unlike the employer

in *Baker*, BLF did not acquire an "absolute control over the life and destiny" of "helpless" employees. Plaintiff has therefore failed to produce any evidence to show that BLF should be subjected to a heightened legal duty based on its undertaking to quarantine Galvan and other COVID-infected employees.

Even if BLF acquired a heightened duty here, the extreme facts of *Baker* illustrate plaintiff's problem proving a breach. On the day before he died, the employee in *Baker* was visited by an individual whom the employees' family had sent to check on him, despite the employer's attempts to thwart such visit. *Id.* at 274. The visitor "ascertained that there had been brutal and criminal neglect." *Id.* at 275. The employee "had been permitted to lie in the most loathsome filth, with the flies lighting on his sores and impregnating him with worms, their vile offspring." *Id.* "It would have taken the skill, power, and compassion of the 'Great Physician' to have snatched health and recovery from the environments created by the servants of [the employer]," for "unquestioned testimony of experienced and unbiased physicians showed that in cases of smallpox, as in the case of other violent diseases, cleanliness and skilled trained nursing are the essentials to recovery." *Id.* at 275.

There is nothing like that in this case. Plaintiff has not alleged that the trailer was unsanitary. She has not alleged that despicable conditions contributed to Galvan's death. Or that Galvan was unable to speak with those outside of the trailer. Or that relatives were unable to visit those who were in quarantine. Or that county authorities and relatives were purposefully kept in the dark. Or that BLF deprived Galvan of anything that was "unquestion[ably]" necessary for a person suffering from COVID to recover. Given the wealth of undisputed evidence, plaintiff's only real complaint might be that Galvan was not evaluated by a medical doctor. But plaintiff does not cite a single Texas case that conjures negligence out of

actions akin to BLF's obvious attempt to properly care for its employees. Her theory of negligent undertaking is therefore fatally flawed.[4]

Apart from her theory of negligent undertaking, plaintiff also contends that under Texas common law, "an employer has a duty to affirmatively provide medical care and assistance to an employee when the employee [(1)] is incapable of helping himself and [(2)] has an immediate and urgent need for medical assistance." *Cooper v. M.N. Gumbert Corp.*, 2018 WL 4470748, at *3–4 (Tex. App.—San Antonio 2018) (citation omitted). To that end, plaintiff alleges that (1) "[a]s an H-2A worker, Mr. Galvan was 'incapable of helping himself' due to both his illness from COVID-19 and his reliance on [BLF] for food, housing, and transportation," and that (2) Galvan "had an 'immediate and urgent need for medical assistance' due to the possibility of complications from the serious disease." This claim fares no better.

As the *Cooper* court explained, "in the absence of circumstances showing an employee is in a state of *helplessness* with an *immediate* and *urgent* need for medical assistance, . . . an employer has no general duty to provide medical assistance to an employee who becomes ill while at work." *Cooper*, 2018 WL 4470748, at *4 (citation omitted) (emphasis added). Plaintiff has offered no evidence that Galvan was "helpless" during the time he quarantined in a trailer with three roommates, cell phones, and supplies, or

---

[4] The court notes that plaintiff's negligence claims also suffer from causation issues. As the district court pointed out, "[t]here is no evidence that additional medical care or other circumstances would have allowed Galvan to survive COVID-19." Plaintiff failed to submit any evidence about this whatsoever on summary judgment. There is no evidence that Galvan's death was a foreseeable result of BLF's breach of a legal duty. Plaintiff cannot show proximate causation. *Carey v. Pure Distrib. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939) (evidence must "justify the conclusion that [the] injury was the natural and probable result of the negligent conduct alleged"). And in the absence of negligence, no hypothetical gross negligence claim is cognizable.

that Galvan required "immediate and urgent" medical care at any point before BLF was notified of an emergency situation and called for an ambulance. *Cf. Atchison, T. & S.F. Ry. Co. v. Hix*, 291 S.W. 281, 284 (Tex. Civ. App.—El Paso 1926, no writ) (holding that railroad employer had "duty to provide emergency medical and surgical attention" when employee who was injured by a moving train "was found upon the track in his helpless mangled condition"); *Welch v. AABTEL, Inc.*, 2015 WL 4196520, at *1 (Tex. App.—Austin July 8, 2015, no pet.) (mem. op.) (declining to hold an employer liable for failing to help an employee suffering from a stroke when that employee was "conscious, lucid, had his normal cognitive functions, and was physically able to work and to summon emergency care").

The court declines to hold that a speculative "possibility of complications" from COVID is the sort of harm that might require an employer to provide "immediate and urgent" medical assistance. The Centers for Disease Control and Prevention ("CDC") published a report with data that reflect an age-adjusted COVID mortality rate of just 93.2 per 100,000 persons in 2020.[5] Put in simpler terms: the CDC estimated approximately one death for every 1,073 cases of COVID in 2020. Moreover, the general CDC guidance in July 2020 for individuals with a COVID diagnosis was to "stay home," "get rest," "stay hydrated," "take over-the counter medicines," "call before seeking medical care," and "seek emergency medical attention" if experiencing "trouble breathing," "persistent pain or pressure in the chest," "new confusion," "inability to

---

[5] Farida B. Ahmad, et al., *COVID-19 Mortality Update—United States, 2022* (May 5, 2023), https://www.cdc.gov/mmwr/volumes/72/wr/pdfs/mm7218a4-H.pdf (visited July 7, 2025).

wake or stay awake," or "bluish lips or face."[6]  The CDC maintained in 2020 that "[m]ost people with COVID-19 have mild illness and can recover at home without medical care."[7]  In the light of this information and guidance, which reflects the best available science at the time of Galvan's death, BLF cannot be faulted for its assumption that fatal complications were unlikely in a working-age man with no known pre-existing condition.

Plaintiff's other scattered allegations with respect to duty and breach are, in general, unavailing, either at war with the facts or unmoored from precedent.  We must address plaintiff's mention of the employment contract. The court is unable to locate, and plaintiff does not cite, any specific provision that BLF clearly breached.  A federal form that BLF was required to complete before participating in the H-2A program pledges that BLF "will provide free transportation to stores at least every two weeks to allow workers to shop for groceries and other necessary items."  The Department of Labor separately requires H-2A participating employers to agree to a boilerplate "transportation and daily subsistence" condition in its employment contracts, but the text of that provision does not mention a specific obligation to provide a particular medical service.  Nothing else in the available employment documents places a specific obligation on BLF to provide medical treatment or otherwise transport BLF employees to town.

In any event, it is undisputed that BLF transported Galvan to the hospital for COVID testing.  The court has examined the record and sees no evidence that Galvan requested more.  Plaintiff has accordingly failed to show

---

[6] Centers for Disease Control and Prevention, *What to Do If You Are Sick* (archived July 2, 2020), https://web.achive.org/web/20200702235647/https:/www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html (visited July 3, 2025).

[7] *Id.*

that BLF violated a duty secured by its employment contracts.  This is a problem both for plaintiff's negligence- and contract-based claims.

We recognize that one of plaintiff's attorneys declared in an attachment to plaintiff's motion to alter or amend the judgment that "[a]s of the completion of briefing on the motion for summary judgment and the Court's summary judgment opinion and entry of final judgement, Plaintiffs had not yet completed discovery."  The district court originally planned for discovery to continue through April 15, 2022 (two months after the district court filed its February 15 opinion and order that granted summary judgment to BLF).  Plaintiff's counsel argued in their motion to alter or amend that additional time for discovery would have allowed plaintiff to create a genuine dispute as to a material fact such that summary judgment would be improper.

After summary judgment briefing concluded, plaintiff deposed Dr. Turner, who she claims testified to the "availability of specific treatments for COVID-19 at Coon Memorial Hospital in Dalhart, Texas." Plaintiff also contends that she should have been given time to depose BLF employees Michelle Andrade, Guillermo Huaracha, and Rodolfo a la Torre Ledesma, BLF's expert witness Dr. Cedric W. Spak, Hartley County Justice of the Peace Beth Moore, and paramedics who responded to the scene.  Last, plaintiff complains that the district court's decision did not discuss her expert report.

The district court did not err when it dismissed these arguments. Plaintiff failed to cite—or mention—her expert report in her summary judgment-related pleadings.  And courts may grant motions for summary judgment before the parties complete discovery. *See* FED. R. CIV. P. 56(b) ("[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery."); *Mendez v. Poitevent*, 823 F.3d 326, 336 (5th Cir. 2016) ("Rule 56 does not require that *any* discovery take

place before summary judgment can be granted." (quoting *Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 756 (5th Cir. 2005))).  Plaintiff did not protest the district court's summary judgment timeline until after she received an adverse ruling.  *See Ferrant v. Lowe's Home Ctrs., Inc.*, 494 F. App'x 458, 463 (5th Cir. 2012) (stating in similar circumstances that plaintiff "cannot argue that the district court erred in granting summary judgment without allowing for sufficient discovery"); 27A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 62:645 (3d ed. 2011) ("Failure to file a Fed. R. Civ. P. [56(d)] motion is itself a sufficient ground to reject a claim that discovery was inadequate, and is also a factor favoring the granting of summary judgment to the movant.").

Not only are the negligence and contract claims deficient, but plaintiff's other claims (*i.e.*, wrongful death, survival, and loss of consortium) fail because they cannot stand alone.  *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 646 (Tex. 2009) (orig. proceeding) (wrongful death is an "entirely derivative cause of action" and a beneficiary cannot pursue "an entirely derivative claim"); *Russel v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 345 (Tex. 1992) (a survival action is also "wholly derivative of the decedent's rights"); *Whittlesey v. Miller*, 572 S.W.2d 665, 666 n.1 (Tex. 1978) ("[L]oss of consortium is not an independent cause of action.").

The outcome *might* be different if there were any evidence to prove that BLF had actual—or even constructive—knowledge that Galvan was suffering from "severe COVID-19 symptoms" in the days leading up to his untimely and tragic death.  But Galvan never indicated that he might need medical assistance.  He lived in a trailer with three roommates, with access to a cell phone, food, and over-the-counter medicine.  He did not tell BLF representatives or those around him that his condition was declining.  BLF cannot be held liable on these facts.

No. 22-10514

For the foregoing reasons, on different grounds, we AFFIRM the judgment of the district court.